292 F.3d 1139
 Lord Simon CAIRNS, John Eversley, Michael Gibbons LVO, F.C.A., JP, Anthony Julius, Lady Sarah McCorquodale, Baroness Jill Pitkeathly Obe, John Reizenstein, Christopher Spence MBE, Nalini Varma, trustees of the Diana, Princess of Wales Memorial Fund, a charitable trust; The Honorable Frances Ruth Shand Kydd, The Lady Elizabeth Sarah Lavina McCorquodale and The Right Reverend and Right Honorable Richard John Carew Chartres, Bishop of London, executors of the Estate of Diana, Princess of Wales; and the Diana, Princess of Wales Memorial Fund (No. 1) Limited, Plaintiffs-Appellants,
v.
FRANKLIN MINT COMPANY, a Delaware partnership; Roll International Holdings, Inc., a Delaware corporation; Stewart Resnick, an individual, Lynda Resnick, an individual, Defendants-Appellees.
 No. 00-56217.
 No. 00-56796.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 12, 2002.
 Filed June 19, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Barbara A. Solomon, Fross Zelnick Lehrman & Zissu, P.C., New York, NY, for the plaintiffs-appellants.
 Robert A. Meyer, Douglas E. Mirell and Daniel J. Friedman, Loeb & Loeb LLP, Los Angeles, CA, for the defendants-appellees.
 Appeal from the United States District Court for the Central District of California; Richard A. Paez and Florence—Marie Cooper, District Judges, Presiding.[1]
 Before: PREGERSON, RYMER, and T.G. NELSON, Circuit Judges.
 PREGERSON, Circuit Judge.
 
 
 1
 Plaintiffs-Appellants are the trustees of the Diana Princess of Wales Memorial Fund ("the Fund") and the executors of the Estate of Diana, Princess of Wales ("the Estate"). We will refer to them collectively as "the Fund." The Fund brought several state and federal claims against Defendant-Appellee Franklin Mint. The Fund based these claims on Franklin Mint's use of the name and likeness of the late Princess Diana on commercially sold jewelry, plates, and dolls, and in advertisements for these products. The Fund appeals three holdings by the District Court: (1) the District Court's denial of the Fund's motion to reinstate its dismissed post-mortem right of publicity claim under California Civil Code § 3344.1(a)(1); (2) the District Court's grant of summary judgment in favor of Franklin Mint on the Fund's Lanham Act claim for false endorsement under 15 United States Code § 1125(a)(1); and (3) the District Court's award of attorneys' fees to Franklin Mint. We have jurisdiction under 28 United States Code § 1291, and we affirm.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 Since 1981, when Princess Diana married Prince Charles, Franklin Mint has produced, advertised, and sold collectibles — jewelry, plates, and dolls — bearing her name and likeness. Similar products bearing Princess Diana's name and likeness were sold by other companies. Princess Diana neither authorized nor objected to any of these products.
 
 
 3
 The Fund was established in 1997 after Princess Diana's death to accept donations to be given to various charities with which Princess Diana was associated during her lifetime. The Estate exclusively authorized the Fund to use Princess Diana's name and likeness for this purpose. The Fund in turn authorized about twenty parties — but not Franklin Mint — to use the name and likeness of Princess Diana in conjunction with products sold in the United States. Franklin Mint continued to market unauthorized Diana-related products.
 
 
 4
 On May 18, 1998, the Fund brought suit against Franklin Mint in the United States District Court for the Central District of California. The complaint alleged violations of the Lanham Act for false endorsement and false advertisement under 15 United States Code § 1125(a)(1), and dilution of trademark under 15 United States Code § 1125(c)(1). The complaint also alleged violations of California's post-mortem right of publicity statute, California Civil Code § 990(a) (now California Civil Code § 3344.1(a)).[2] The complaint finally alleged unfair competition and false and misleading advertisement under California Business and Professions Code §§ 17200 and 17500 et seq.
 
 
 5
 On October 16, 1998, the District Court granted Franklin Mint's motion to dismiss the Fund's post-mortem right of publicity claim under California Civil Code § 990. Cairns v. Franklin Mint Co., 24 F.Supp.2d 1013, 1022 (C.D.Cal.1998) ["Cairns I"]. The District Court reasoned that California's default personal property choice of law provision, California Civil Code § 946,[3] applied to the Fund's post-mortem right of publicity claim and required application of the law of Great Britain, which does not recognize a post-mortem right of publicity. Cairns I, 24 F.Supp.2d at 1023-29. The District Court denied Franklin Mint's motion to dismiss the Fund's Lanham Act claims for false endorsement, false advertisement, and dilution of trademark. Id. at 1022-23. The District Court also denied the Fund's motion for a preliminary injunction on these Lanham Act claims. Id. at 1023. On December 30, 1999, on interlocutory appeal under 28 United States Code § 1292(a)(1), we affirmed the District Court's dismissal of the Fund's post-mortem right of publicity claim and the denial of a preliminary injunction on the Fund's Lanham Act claims in an unpublished memorandum disposition which was amended on February 24, 2000. Diana Princess of Wales Memorial Fund v. Franklin Mint Co., Nos. 98-56722, 99-55157, 1999 WL 1278044 (9th Cir. Feb. 24, 2000).
 
 
 6
 After the District Court dismissed the Fund's post-mortem right of publicity claim, the California Legislature renumbered the post-mortem right of publicity statute from § 990 to § 3344.1 and amended it to "apply to the adjudication of liability and the imposition of any damages or other remedies in cases in which the liability, damages, and other remedies arise from acts occurring directly in this state." CAL. CIV. CODE § 3344.1(n). Based on this amendment, the Fund filed a motion to reinstate its dismissed post-mortem right of publicity claim. The Fund argued that § 3344.1(n) is a choice of law provision that requires application of California law, which recognizes a post-mortem right of publicity.
 
 
 7
 On June 22, 2000, the District Court denied the Fund's motion to reinstate its post-mortem right of publicity claim and motion for a preliminary injunction. Cairns v. Franklin Mint Co., 120 F.Supp.2d 880, 887 (C.D.Cal.2000) ["Cairns II"]. The District Court concluded, based on the plain language of § 3344.1(n) and its legislative history, that this section is not a choice of law provision. Id. at 883-85. The District Court further concluded that California's default personal property choice of law provision, California Civil Code § 946, continues to apply to the Fund's post-mortem right of publicity claim and requires application of the law of Great Britain, which does not recognize a post-mortem right of publicity. Cairns II, 120 F.Supp.2d at 881-82.
 
 
 8
 On June 27, 2000, the District Court granted Franklin Mint's motion for summary judgment on the Fund's Lanham Act false endorsement claim. Cairns v. Franklin Mint Co., 107 F.Supp.2d 1212, 1223 (C.D.Cal.2000) ["Cairns III"]. The District Court concluded that Franklin Mint's use of Princess Diana's name and likeness did not implicate the source identification purpose of trademark protection. Id. at 1214-16. The District Court also applied AMF Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir.1979), and concluded that there was no likelihood of consumer confusion as to the origin of Franklin Mint's Diana-related products. Cairns III, 107 F.Supp.2d at 1216-21.[4]
 
 
 9
 On September 12, 2000, the District Court granted Franklin Mint's motion for attorneys' fees and awarded Franklin Mint $2,308,000 in attorneys' fees out of $3,124,121.85 requested. Cairns v. Franklin Mint Co., 115 F.Supp.2d 1185, 1190 (C.D.Cal.2000) ["Cairns IV"].
 
 
 10
 The Fund timely appealed the District Court's denial of its motion to reinstate the post-mortem right of publicity claim and the District Court's grant of Franklin Mint's motion for summary judgment on the Lanham Act claim for false endorsement (No. 00-56217). Separately, the Fund timely appealed the District Court's award of attorneys' fees to Franklin Mint (No. 00-56796). The two appeals have been consolidated.
 
 II. POST-MORTEM RIGHT OF PUBLICITY CLAIM
 A. Introduction
 
 11
 California's post-mortem right of publicity statute, in both its former version, California Civil Code § 990(a) (West 1998), and its current version, California Civil Code § 3344.1(a) (West 2002), provides in part that "[a]ny person who uses a deceased personality's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, without prior consent from the [decedent's successor or successors in interest], shall be liable for any damages sustained by the person or persons injured as a result thereof." It further provides that "[t]he rights recognized under this section are [personal] property rights." CAL. CIV. CODE § 990(b) (West 1998); CAL. CIV. CODE § 3344.1(b) (West 2002).
 
 
 12
 As enacted in 1984 and amended in 1988, California's post-mortem right of publicity statute did not contain a choice of law provision. See CAL. CIV. CODE § 990 (West 1998). The District Court concluded that California's default personal property choice of law provision in California Civil Code § 946 applied to the Fund's post-mortem right of publicity claim and required application of the law of the decedent's domicile.[5] The law of Great Britain, where Princess Diana was domiciled, does not recognize post-mortem right of publicity claims. See Bi-Rite Enters. v. Bruce Miner Co., 757 F.2d 440, 442 (1st Cir.1985) (citing Tolley v. Fry, 1 K.B. 467 (1930)); J. Thomas McCarthy, Rights of Publicity & Privacy, § 6.21 (1998). Accordingly, the District Court dismissed the claim. On interlocutory appeal of this dismissal and the accompanying denial of a preliminary injunction, we affirmed by memorandum disposition.
 
 
 13
 Effective January 1, 2000, the Legislature renumbered California's post-mortem right of publicity statute from § 990 to § 3344.1 and amended it to "apply to the adjudication of liability and the imposition of any damages or other remedies in cases in which the liability, damages, and other remedies arise from acts occurring directly in this state." CAL. CIV. CODE § 3344.1(n) (West 2002). The former version of the statute contained no comparable provision. See CAL. CIV. CODE § 990 (West 1998). Following this amendment, the Fund moved to reinstate its post-mortem right of publicity claim, arguing that § 3344.1(n) is a choice of law provision that requires application of California law. The District Court denied the motion, concluding that § 3344.1(n) is not a choice of law provision. The District Court further concluded that California's default personal property choice of law provision in California Civil Code § 946 applies to the current version of the post-mortem right of publicity in § 3344.1 — as it did to the former version of that right in § 990 — and requires the application of the law of the decedent's domicile, Great Britain, which does not recognize a post-mortem right of publicity.
 
 
 14
 The Fund argues before us — as it did before the District Court — that § 3344.1(n) is a choice of law provision requiring application of California law to its post-mortem right of publicity claim. We review questions of statutory interpretation de novo. See In re MacIntyre, 74 F.3d 186, 187 (9th Cir.1996). We conclude that the plain language of § 3344.1(n), as well as its legislative history, supports the District Court's decision not to reinstate the Fund's post-mortem right of publicity claim.
 
 B. Plain Language of the Statute
 
 15
 Courts "must interpret a ... statute according to its plain meaning, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." In re Arden, 176 F.3d 1226, 1229 (9th Cir.1999) (quoting United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)) (internal quotation marks omitted). Section 3344.1(n) limits the application of California's post-mortem right of publicity statute to "cases in which the liability, damages, and other remedies arise from acts occurring directly in this state." The District Court concluded that by the plain meaning of its language, this provision is not a choice of law provision, but "simply addresses the reach of the statute's coverage." Cairns II, 120 F.Supp.2d at 883.
 
 
 16
 We agree. Section 3344.1(b) provides that the post-mortem right of publicity is a (personal) property right. Section 3344.1(n) states that California's post-mortem right of publicity statute "shall apply to cases ... aris[ing] from acts occurring directly in [California]." Section 3344.1(n) does not state that California's post-mortem right of publicity statute applies to such cases regardless of the domicile of the owner of the right. Section 946 provides that personal property is governed by the law of the domicile of its owner unless there is law to the contrary in the place where the personal property is situated, i.e., California. See supra note 5. The statement in § 3344.1(n) that California's post-mortem right of publicity statute "shall apply to cases ... aris[ing] from acts occurring directly in [California]" is compatible with the post-mortem right of publicity being governed by the law of the domicile of its owner, because the statute does not state by its plain language that such cases are not governed by the law of the domicile of the owner. Thus, there is no "law to the contrary" to prevent application of the default choice of law provision in § 946 to the post-mortem right of publicity statute in § 3344.1. Accordingly, unless the "literal application" of the statute will produce "a result demonstrably at odds with the intentions of its drafters," Arden, 176 F.3d at 1229, § 946 applies to § 3344.1, and the Fund's post-mortem right of publicity claim is foreclosed.
 
 
 17
 The Fund argues that "[t]here is nothing in [§ 3344.1] to suggest that a court should look to Cal. Civil Code § 946 ... to determine whether the post-mortem right of publicity applies to a particular plaintiff or her heirs." Section 946, however, is a default choice of law provision that applies "[i]f there is no law to the contrary," and no explicit reference to this default provision should be expected in § 3344.1 — let alone required — for § 946 to apply.
 
 C. Legislative History
 
 18
 The legislative history of § 3344.1 further supports our conclusion that § 3344.1(n) is not a choice of law provision. On January 20, 1999, Senator Burton introduced Senate Bill 209 seeking to amend the former version of the post-mortem right of publicity statute in § 990. The proposed amendment initially contained a subsection (o) that stated: "[A] plaintiff has standing to bring an action pursuant to this section if any of the acts giving rise to the action occurred in this state, whether or not the plaintiff is a domiciliary of this state." Cairns II, 120 F.Supp.2d at 884 (emphasis added). The "domiciliary of this state" language was later deleted from the proposed amendment. The amendment was ultimately adopted without this language as § 3344.1(n), which reads as follows: "This section shall apply to the adjudication of liability and the imposition of any damages or other remedies in cases in which the liability, damages, and other remedies arise from acts occurring directly in this state." CAL. CIV. CODE § 3344.1(n) (West 2002).
 
 
 19
 The California Assembly Judiciary Committee Hearing of June 22, 1999 provides evidence that the Legislature did not intend § 3344.1(n), as adopted, to prevent application of § 946 to the post-mortem right of publicity. During that hearing, Senator Burton attempted to re-introduce the "domiciliary of this state" language. Assembly Member and Committee Vice-Chair Pacheco asked whether such an addition was necessary and whether there was "any law that says you have to be domiciled in the state at the time of death." Mark Lee, counsel for the Fund in this case before the District Court and present at the hearing on behalf of the Fund as a proponent of Senate Bill 209, answered that the District Court in Cairns I had "held that domicile was required."[6] After further discussion, Senator Burton withdrew his proposed amendment to add the "domiciliary of the state" language to what became § 3344.1(n).
 
 
 20
 We have observed that "California courts give substantial weight to the deletion of a provision during the drafting stage. `The rejection by the Legislature of a specific provision contained in an act as originally introduced is most persuasive to the conclusion that the act should not be construed to include the omitted provision.'" Jimeno v. Mobil Oil Corp., 66 F.3d 1514, 1530 (9th Cir.1995) (quoting Rich v. State Bd. of Optometry, 235 Cal. App.2d 591, 45 Cal.Rptr. 512, 522 (1965)). Here, the Committee deleted the "domiciliary of this state" language and resisted Senator Burton's attempt to reinsert this language. The Legislature ultimately passed § 3344.1(n) without the "domiciliary of this state" language. Under Jimeno, this "rejection by the Legislature" of the "domiciliary of this state" language is "most persuasive to the conclusion that [§ 3344.1(n)] should not be construed to include the omitted [`domiciliary of this state' language]." 66 F.3d at 1530. The rejection of the "domiciliary of this state" language is made more persuasive by the California Assembly Judiciary Committee's insistence on deleting this language although the Committee was made aware that the District Court's decision in Cairns I required domicile in California in the absence of such language.
 
 
 21
 Taken together, the legislative history strongly indicates that the Legislature did not intend to statutorily overrule the District Court's requirement of California domicile in Cairns I. Thus, a "literal application" of § 3344.1(n) will not produce "a result demonstrably at odds with the intentions of its drafters." Arden, 176 F.3d at 1229. Accordingly, the Fund's post-mortem right of publicity claim must fail because the law of Princess Diana's domicile, Great Britain, governs and that law does not recognize a post-mortem right of publicity.
 
 III. FALSE ENDORSEMENT
 A. Introduction
 
 22
 The District Court granted Franklin Mint's motion for summary judgment on the Fund's Lanham Act claim for false endorsement because Franklin Mint's use of Princess Diana's name and likeness did not implicate the source-identification purpose of trademark protection, and because there was no likelihood of customer confusion as to the origin of Franklin Mint's Diana-related products. We review a grant of summary judgment de novo. Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir.2000) (en banc). We must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the District Court correctly applied the relevant substantive law. Id.
 
 
 23
 Under the Lanham Act's false endorsement provision,
 
 
 24
 Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, ... shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.
 
 
 25
 15 U.S.C. § 1125(a)(1).
 
 
 26
 Under the law of false endorsement, likelihood of customer confusion is the determinative issue. See Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1403 (9th Cir.1997) ("`Likelihood of Confusion' is the basic test for... trademark infringement."). Between 1981 and 1997, many products, including some that were largely indistinguishable from Franklin Mint products, bore the name and likeness of Princess Diana, who neither endorsed nor objected to any of these products. Consumers, therefore, had no reason to believe Franklin Mint's Diana-related products were endorsed by the Princess. This did not change when, following Princess Diana's death in 1997, the Fund endorsed approximately twenty products — but not Franklin Mint's — amidst a flood of un-endorsed Diana-related memorabilia. Under these circumstances, there was no likelihood of confusion as to the origin of Franklin Mint's Diana-related products. In addition, Franklin Mint is entitled to a "fair use" defense for its references to Princess Diana to describe its Diana-related products. Accordingly, the District Court did not err when it granted summary judgment in favor of Franklin Mint on this claim.
 
 
 27
 B. The Distinction Between the Classic Fair Use and Nominative Fair Use Defenses
 
 The District Court held:
 
 28
 Defendants' use of the image of Princess Diana on their products and the words "Diana, Princess of Wales," to describe their products does not imply endorsement by plaintiffs. Because defendants' use does not implicate the source-identification purpose of trademark protection, it falls outside the scope of § 1125(a), and defendants are entitled to summary adjudication of the false endorsement claim as a matter of law.
 
 
 29
 Cairns III, 107 F.Supp.2d at 1216 (emphasis added). In support of this holding, the District Court quoted our conclusion in New Kids on the Block v. News Am. Publ'g, Inc., 971 F.2d 302, 308 (9th Cir.1992), that "nominative [fair] use of a mark ... lies outside the strictures of trademark law ... [b]ecause it does not implicate the source-identification function that is the purpose of trademark." The District Court stated: "Although the New Kids court reached the above conclusion in analyzing defendants' [nominative] fair use defense, the same threshold consideration is applicable to this case...." Cairns III, 107 F.Supp.2d at 1216. We agree that New Kids' "threshold consideration" applies in the present case and conclude that Franklin Mint is entitled to a nominative fair use defense for its references to Princess Diana to describe its Diana-related products.
 
 
 30
 We distinguish two types of fair use: "classic fair use," in which "the defendant has used the plaintiff's mark to describe the defendant's own product," and "nominative fair use," in which the defendant has used the plaintiff's mark "to describe the plaintiff's product" for the purpose of, for example, comparison to the defendant's product. New Kids, 971 F.2d at 308 (second emphasis added). The distinction between classic and nominative fair use is important for two reasons: (1) classic and nominative fair use are governed by different analyses; and (2) the classic fair use analysis only complements the likelihood of customer confusion analysis set forth in Sleekcraft,[7] whereas the nominative fair use analysis replaces the Sleekcraft analysis.
 
 
 31
 Under the common law classic fair use defense codified in the Lanham Act at 15 United States Code § 1115(b), "[a] junior user is always entitled to use a descriptive term in good faith in its primary, descriptive sense other than as a trademark." 2 McCarthy on Trademark and Unfair Competition § 11:45 (4th ed.2001). To establish a classic fair use defense, a defendant must prove the following three elements: "1. Defendant's use of the term is not as a trademark or service mark; 2. Defendant uses the term `fairly and in good faith'; and 3. [Defendant uses the term] `[o]nly to describe' its goods or services." Id. at § 11:49 (quoting 15 U.S.C. § 1115(b)). In our Circuit, the classic fair use defense is not available if there is a likelihood of customer confusion as to the origin of the product. See Transgo, Inc. v. Ajac Transmission Parts Corp., 911 F.2d 363, 365 n. 2 (9th Cir.1990) (classic fair use defense available only so long as such use does not lead to customer confusion as to the source of the goods or services); Lindy Pen Co. v. Bic Pen Corp., 725 F.2d 1240, 1248 (9th Cir.1984) (same). The classic fair use analysis, therefore, only complements the likelihood of customer confusion analysis set forth in Sleekcraft.
 
 
 32
 In New Kids, by contrast, we developed a nominative fair use analysis that replaces the likelihood of customer confusion analysis set forth in Sleekcraft. See Playboy Enters., Inc. v. Welles, 279 F.3d 796, 801 (9th Cir.2002) (stating that "[i]n cases in which the defendant raises a nominative [fair] use defense, the [New Kids] test should be applied instead of the test for likelihood of confusion set forth in Sleekcraft" because it "better evaluates the likelihood of confusion in nominative [fair] use cases"). To establish a nominative fair use defense, a defendant must prove the following three elements:
 
 
 33
 First, the [plaintiff's] product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the [plaintiff's] product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.
 
 
 34
 New Kids, 971 F.2d at 308 (footnote omitted).
 
 
 35
 The nominative fair use analysis is appropriate where a defendant has used the plaintiff's mark to describe the plaintiff's product, even if the defendant's ultimate goal is to describe his own product.[8] Conversely, the classic fair use analysis is appropriate where a defendant has used the plaintiff's mark only to describe his own product, and not at all to describe the plaintiff's product.[9] We hold that Franklin Mint's use of Princess Diana's name and likeness fits the former definition and that, therefore, the nominative fair use analysis rather than the classic fair use analysis is appropriate in the present case.
 
 
 36
 New Kids involved the use by the defendants — two newspapers — of the trademarked name of the plaintiff — a teen band — to publicize the newspapers' telephone polls about the band. See 971 F.2d at 304. The newspapers used the trademark, i.e., "The New Kids," to describe the plaintiff's product, i.e., the band "The New Kids on the Block." The newspapers' ultimate goal, however, was to describe their own products, i.e., telephone polls about the band "The New Kids on the Block." Application of the nominative fair use analysis was appropriate in New Kids because the defendants had used the plaintiff's mark to describe the plaintiff's product, even though the defendants' ultimate goal was to describe their own products.
 
 
 37
 The same is true of the three cases we cited in New Kids as nominative fair use cases. Id. at 307-08. In Volkswagenwerk Aktiengesellschaft v. Church, 411 F.2d 350 (9th Cir.1969), an automobile repair business specializing in the repair of Volkswagen and Porsche vehicles placed a large sign on the front of the premises that read "Modern Volkswagen Porsche Service." Id. at 351. "Volkswagen" was a registered trademark of the plaintiff. Id. In WCVB-TV v. Boston Athletic Ass'n, 926 F.2d 42 (1st Cir.1991), a television station made unauthorized broadcasts of — and referred by name to — the "Boston Marathon," an annual sports event organized and trademarked under that name. Id. at 44. And in Smith v. Chanel, Inc., 402 F.2d 562 (9th Cir.1968), an imitator of brand perfumes advertised his "2d Chance" perfume as indistinguishable from the trademarked "Chanel # 5" perfume. Id. at 563.
 
 
 38
 In each of these three cases, the alleged infringer used the trademark — "Volkswagen," "Boston Marathon," and "Chanel # 5" — to describe the alleged infringee's product — the automobile, sports event, and perfume designated by that name. In each of these cases, however, the alleged infringer's ultimate goal was to describe his own product — an automobile repair business specializing in the repair of Volkswagens, a television broadcast of the Boston Marathon, and a perfume indistinguishable from Chanel # 5. As in New Kids, application of the nominative fair use analysis was appropriate in each of these cases because the alleged infringer had used the alleged infringee's mark to describe the product of the infringee, even though the infringer's ultimate goal was to describe his own product.[10]
 
 
 39
 To summarize, courts should use the New Kids nominative fair use analysis in cases where the defendant has used the plaintiff's mark to describe the plaintiff's product, even if the defendant's ultimate goal was to describe his own product. By contrast, courts should use the traditional classic fair use analysis in cases where the defendant has used the plaintiff's mark only to describe his own product, and not at all to describe the plaintiff's product.
 
 
 40
 C. Application of the Nominative Fair Use Defense
 
 
 41
 In the present case, Princess Diana is the Fund's "product" and Princess Diana's name and likeness are the Fund's marks. Franklin Mint used Princess Diana's name and likeness to describe Princess Diana, although Franklin Mint's ultimate goal was to describe its own Diana-related products.[11] Because Franklin Mint used the Fund's mark to describe the Fund's product, we apply the New Kids nominative fair use analysis, even though Franklin Mint's ultimate goal was to describe its own products.
 
 
 42
 The first element of the New Kids nominative fair use test is that "the [Fund's] product ... must be one not readily identifiable without use of the trademark." 971 F.2d at 308. We explained in New Kids that "one might refer to `the two-time world champions' or `the professional basketball team from Chicago,' but it's far simpler (and more likely to be understood) to refer to the Chicago Bulls." Id. at 306. Similarly, one might refer to "the English princess who died in a car crash in 1997," but it is far simpler (and more likely to be understood) to refer to "Princess Diana." We therefore hold that Princess Diana's person is not readily identifiable without use of her name.
 
 
 43
 There is no substitute for Franklin Mint's use of Princess Diana's likeness on its Diana-related products. Nor is there a substitute for Franklin Mint's use of Princess Diana's likeness in its advertisements for these products. For example, one might explain — as Franklin Mint in fact did — that the "Diana, The People's Princess Doll" is "[d]ressed in the stylish light-blue suit [Princess Diana] wore when she was presented with her signature flower" and "[c]ompletely accessorized with [a] purse and a tiny bouquet of Princess of Wales Roses" that Princess Diana carried on the same occasion. But it is far simpler (and more likely to be understood) to juxtapose — as Franklin Mint also did — a picture of the doll and a photograph of Princess Diana wearing the same suit and carrying the same purse and the same bunch of flowers.[12] We therefore hold that Princess Diana's physical appearance is not readily identifiable without the use of her likeness. Thus, the first element of the New Kids nominative fair use test is met.
 
 
 44
 The second element of the New Kids nominative fair use test is that "only so much of the mark or marks may be used as is reasonably necessary to identify the [Fund's] product or service." Id. at 308. We explained in New Kids:
 
 
 45
 Thus, a soft drink competitor would be entitled to compare its product to Coca-Cola or Coke, but would not be entitled to use Coca-Cola's distinctive lettering. See Volkswagenwerk, 411 F.2d at 352 ("Church did not use Volkswagen's distinctive lettering style or color scheme, nor did he display the encircled `VW' emblem")....
 
 
 46
 Id. at 308 n. 7.
 
 
 47
 In the present case, there is no allegation that Franklin Mint used any "distinctive lettering" or any particular image of Princess Diana intimately associated with the Fund. See, e.g., Toho Co. v. William Morrow & Co., 33 F.Supp.2d 1206, 1209, 1211 (C.D.Cal.1998) (holding that a publisher who used the trademark "Godzilla" as the title of a book about the movie-monster by the same name used more of the mark than was "reasonably necessary" where "the title[was] written in the distinctive lettering style used by [the trademark holder] and its licensees in their merchandising activities").
 
 
 48
 What is "reasonably necessary to identify the plaintiff's product" differs from case to case. Compare Playboy Enters., Inc., 279 F.3d at 804 (holding that "[t]he repeated depiction of `PMOY '81' is not necessary to describe" a former "Playmate of the Year" on her website), with Mattel, Inc. v. MCA Records, Inc., 28 F.Supp.2d 1120, 1142 (C.D.Cal.1998) (holding that "the repeated use of the words `Barbie' and `Ken' are reasonably necessary for the purposes of parody" in a song lampooning the lifestyle associated with these dolls).
 
 
 49
 Where, as in the present case, the description of the defendant's product depends on the description of the plaintiff's product, more use of the plaintiff's trademark is "reasonably necessary to identify the plaintiff's product" than in cases where the description of the defendant's product does not depend on the description of the plaintiff's product. For example, General Motors would probably be able to sell its Oldsmobile Eighty-Eight without any reference to a basketball star who, like the car, received an award three years in a row. See Abdul-Jabbar, 85 F.3d at 409. But it is doubtful whether Franklin Mint would be able to sell its "Diana, Princess of Wales Porcelain Portrait Doll" without prominent reference to Princess Diana. Not every Franklin Mint customer can be expected to recognize Princess Diana's features on the doll. And even fewer Franklin Mint customers can be expected to recognize Princess Diana's royal tiara and bolero jacket on the doll. Accordingly, a caption reading "Diana" is "reasonably necessary" to identify Princess Diana. Similarly, a photograph showing Princess Diana wearing her royal tiara and bolero jacket is "reasonably necessary" to identify these accessories of Princess Diana. In a nutshell, Franklin Mint had to ensure that its customers understood the references to Princess Diana, and it did what was "reasonably necessary" for this purpose.[13] Thus, the second element of the New Kids nominative fair use test is also met.
 
 
 50
 The third and final element of the New Kids nominative fair use test is that "the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." 971 F.2d at 308. None of Franklin Mint's advertisements for its Diana-related products claim that these products are sponsored or endorsed by the Fund. Nor do any of these advertisements bear a disclaimer that the products are not sponsored or endorsed by the Fund. By contrast, Franklin Mint's advertisements for some of its other celebrity-related products in the same catalogue do state that they are "authorized" by a trademark holder. The absence of similar statements in Franklin Mint's advertisements for its Diana-related products suggests that they are not sponsored or endorsed by the Fund.
 
 
 51
 In addition to its other use of Princess Diana's name and likeness, Franklin Mint asked prospective purchasers of "The Princess Diana Tribute Plate" to "Join with the Franklin Mint to Continue Princess Diana's Important Work." Accompanying this request was a promise that "[a]ll proceeds" would be donated to what Franklin Mint alternatively described as "Diana, Princess of Wales' Charities" and "Diana, Princess of Wales' Favorite Charities." The District Court concluded that "[a]mple evidence before the Court demonstrates that the association between the image of Princess Diana and[the Fund] is negligible." Cairns III, 107 F.Supp.2d at 1217. The same is true regarding the association of the name of Princess Diana and the Fund. Similarly, there is no evidence that "Diana, Princess of Wales' [Favorite] Charities" have become so closely associated with the Fund that any reference to them in these terms would suggest sponsorship or endorsement by the Fund.
 
 
 52
 Franklin Mint advertised its "Diana, Princess of Wales Porcelain Portrait Doll" as "[d]ressed in the only authentic replica of the stunning designer gown with bolero jacket sold at Christie's Auction" (emphasis in original). Here, the word "authentic" suggests an authentic portrayal of the past; it does not suggest sponsorship or endorsement. Similarly, Franklin Mint promised that its "The Princess of Wales Rose" collector plate "from Capodimonte, the European Masters of floral portraiture" comes with "a special Certificate of Authenticity" (emphasis added). In this context, "authenticity" refers to the origin of the plate with Franklin Mint or Capodimonte. It does not suggest sponsorship or endorsement by the Fund.
 
 
 53
 Although the issue of suggested sponsorship or endorsement may be a closer call than the first two elements of the New Kids nominative fair use test, we conclude that this third and last element of the New Kids nominative fair use test is met as well. We therefore hold that Franklin Mint's use of the name and likeness of Princess Diana was a permissible nominative fair use. Because there are no genuine issues of material fact, even when viewing the evidence in the light most favorable to the Fund, the District Court's grant of summary judgment in favor of Franklin Mint on the Fund's false endorsement claim was appropriate.[14]
 
 IV. ATTORNEYS' FEES
 
 54
 The District Court awarded Franklin Mint $2,308,000 in attorneys' fees. We review such an award for an abuse of discretion, United States v. Lindberg, 220 F.3d 1120, 1124 (9th Cir.2000), and, finding no abuse of discretion, we affirm.
 
 A. Entitlement to Attorneys' Fees
 
 55
 California's post-mortem right of publicity statute provides that "[t]he prevailing party or parties in any action under this section shall also be entitled to attorneys' fees and costs." CAL. CIV. CODE § 3344.1(a)(1) (emphasis added). Because we affirm the District Court's denial of the Fund's motion to reinstate its California post-mortem right of publicity claim, we also affirm the District Court's determination that Franklin Mint, as the prevailing party in this claim, is entitled to recover the attorneys' fees and costs associated with this claim.
 
 
 56
 We further affirm the District Court's determination that Franklin Mint is entitled to attorneys' fees and costs associated with the Fund's Lanham Act claims for false advertisement and dilution of trademark. The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a) (emphasis added). We have held that this requirement is met when the case is either "groundless, unreasonable, vexatious, or pursued in bad faith." Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 881 (9th Cir.1999) (emphasis added) (quoting Stephen W. Boney, Inc. v. Boney Servs., Inc., 127 F.3d 821, 827 (9th Cir.1997)).
 
 
 57
 The District Court found that the false advertisement claim was groundless and unreasonable because the statements in the advertisements at issue were true and the Fund had no reasonable basis to believe they were false. See Cairns IV, 115 F.Supp.2d at 1189. This finding did not constitute an abuse of discretion and was, under Avery, sufficient to justify an award of attorneys' fees to Franklin Mint on this claim.
 
 
 58
 The District Court also found that the dilution of trademark claim was groundless and unreasonable because it had no legal basis, having been based on the "absurd" and "just short of frivolous" contention that the mark "Diana, Princess of Wales" has taken on a secondary meaning in the mind of the public and now primarily identifies "charitable and humanitarian services rather than Princess Diana the individual." Cairns IV, 115 F.Supp.2d at 1188-89; Cairns III, 107 F.Supp.2d at 1222. This finding again did not constitute an abuse of discretion and was, under Avery, sufficient to justify an award of attorneys' fees to Franklin Mint on this claim.[15]
 
 
 59
 In sum, we hold that the District Court did not abuse its discretion in finding that Franklin Mint was entitled to attorneys' fees for the Fund's post-mortem right of publicity, false advertisement, and dilution of trademark claims. For the reasons discussed below, we hold that the District Court also did not abuse its discretion in calculating the amount of the attorneys' fees awarded to Franklin Mint.
 
 B. Amount of Attorneys' Fees
 
 60
 According to the "lodestar" method developed by the Supreme Court, "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The Fund mainly takes issue with the District Court's determination of the number of hours reasonably expended by Franklin Mint on the litigation.
 
 
 61
 Franklin Mint requested $3,124,121.85 in attorneys' fees for over 10,900 hours of work by forty-five timekeepers. Franklin Mint allocated some hours exclusively to the right of publicity claim, and other hours exclusively to the trademark claims. Still other hours were not exclusively allocated by Franklin Mint to either type of claim, but were instead allocated half to the right of publicity claim and half to the trademark claims. Any hours allocated in whole or in part to the trademark claims were allocated to the false endorsement, dilution of trademark, and false advertisement claims collectively and not to any one trademark claim individually.
 
 
 62
 The District Court found that the unusually large number of hours and timekeepers made application of the traditional lodestar method unworkable. Instead, the District Court concluded that Franklin Mint's fee request was an appropriate starting point because Franklin Mint had made a good faith effort to exclude from the fee request hours that were excessive, redundant, or otherwise unnecessary. The District Court then reduced the fee request by approximately twenty-six percent from $3,124,121.85 to $2,308,000 based on the following four findings.
 
 
 63
 First, the District Court found that it was inappropriate to allocate half of the hours which were not exclusively allocated to either claim to the right of publicity claim because that claim was on interlocutory appeal while the trademark claims were being litigated. Therefore, the District Court changed the allocation, allocating only one quarter of the not exclusively allocated hours to the right of publicity claim and allocating the remaining three quarters of that time to the trademark claims. Second, because the District Court found that Franklin Mint was not entitled to recover attorneys' fees for the false endorsement trademark claim, the District Court reduced the fees attributed to the trademark claims by thirty percent. Third, the District Court reduced the computer research fees by twenty-five percent because computer research charges are not an exact substitute for an attorney's hourly rate, and because a portion of these charges must be considered overhead. Fourth, the District Court found that Franklin Mint could not recover any of its fees for lobbying against attempts to change California's post-mortem right of publicity statute.
 
 
 64
 The District Court did not abuse its discretion in making an award that substantially reduced Franklin Mint's attorneys' fees request. The Supreme Court has observed that where, as 8812 in this case, the plaintiff's claims involve a "common core of facts" or are based on "related legal theories," it is "difficult to divide the hours expended on a claim-by-claim basis." Hensley, 461 U.S. at 435, 103 S.Ct. 1933. This Circuit has cautioned, however, that "the impossibility of making an exact apportionment [between recoverable Lanham Act claims and non-recoverable non-Lanham Act claims] does not relieve the district court of its duty to make some attempt to adjust the fee award in an effort to reflect an apportionment." Gracie v. Gracie, 217 F.3d 1060, 1070 (9th Cir.2000). By analogy, the same rule should apply in cases such as this one, which involves non-recoverable Lanham Act claims, rather than — as Gracie did — non-recoverable non-Lanham Act claims.
 
 
 65
 In the present case, the District Court attempted to "adjust the fee award in an effort to reflect an apportionment." Id. Far from "uncritically accept[ing] a party's representations as to the time and money reasonably spent on the case," Gracie, 217 F.3d at 1071, the District Court reduced the fees sought by twenty-six percent or several hundred thousand dollars. A percentage reduction was appropriate in this case. See Hensley, 461 U.S. at 438 n. 13, 103 S.Ct. 1933 (finding that the district court properly reduced the hours of one attorney by thirty percent to account for, inter alia, his failure to keep contemporaneous time records); see also 5 McCarthy, supra, at § 30:102 ("[I]t is appropriate for the court to reduce a total attorney fee amount by a percentage which represents work on[non-recoverable] non-Lanham Act claims."). During oral argument on Franklin Mint's motion for attorneys' fees, the Fund itself proposed a percentage reduction, arguing that ten percent — rather than twenty-five percent — of the not exclusively allocated time was "properly allocatable to the right of publicity claim" and that the fees attributed to the trademark claims should be reduced by thirty-three percent — rather than thirty percent. The District Court did not abuse its discretion by adopting a different percentage reduction that is less favorable to the Fund.
 
 
 66
 "[I]n appropriate cases, the district court may adjust the `presumptively reasonable' lodestar figure based upon the factors listed in Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 69-70 (9th Cir. 1975)...." Intel Corp. v. Terabyte Int'l, Inc., 6 F.3d 614, 622 (9th Cir.1993) (emphasis added).[16] "The court need not consider all ... factors, but only those called into question by the case at hand and necessary to support the reasonableness of the fee award." Kessler v. Assocs. Fin. Servs. Co. of Hawaii, 639 F.2d 498, 500 n. 1 (9th Cir.1981).
 
 
 67
 The Fund complains that the District Court failed to consider the last Kerr factor, i.e., awards in similar cases. The Fund points to the allegedly "unprecedented size of the award" and claims that "the District Court's award of over $1.6 million for the Lanham Act claims may be the first fee award in a Lanham Act case to exceed $1 million."
 
 
 68
 The allegedly "unprecedented size of the award" does not automatically make it unreasonable. See Fantasy, Inc. v. Fogerty, 94 F.3d 553, 560-561 (9th Cir.1996) (discounting party's argument that award of $1,347,519.15 in attorneys' fees in copyright litigation was three times larger than any other award it had seen, and commenting that "comparisons to fee awards in other cases are largely irrelevant, and certainly not determinative, inasmuch as the reasonableness of a particular fee award depends on a case-by-case analysis"). When considering "awards in similar cases," the amount in controversy in those cases cannot be ignored. In its Lanham Act claims, the Fund reportedly sought $32,252,000 in lost profits plus an unspecified amount for loss of goodwill and lost business opportunities.[17] The ratio between the attorneys' fees awarded to defendant Franklin Mint and the damages sought by the Fund in this unsuccessful Lanham Act case is at most one to fourteen. This ratio is not disproportionately higher than the ratios between the attorneys' fees and the damages awarded to plaintiffs in successful Lanham Act cases. In fact, the ratio in this case is considerably lower than the ratios in some of those cases.[18] See, e.g., Taco Cabana Int'l, Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1117 (5th Cir.1991) (affirming an award of $937,550 in attorneys' fees to a party who had been awarded less than twice as much in damages); Universal City Studios, Inc. v. Nintendo Co., 797 F.2d 70, 77 (2d Cir. 1986) (affirming an attorneys' fees award that, at $1,142,545.70, exceeded the damages by almost 150%).
 
 
 69
 Equally important is the undisputed fact that the Fund itself has expended £ 1.7 million British pounds (approximately $2.6 million) on this case, several hundred thousand dollars more than the amount the District Court awarded to Franklin Mint. In light of the District Court's substantial reductions of Franklin Mint's fee request, the very large amount at stake in this case, and the $2.6 million expended by the Fund on this case, the District Court did not abuse its discretion when it awarded Franklin Mint $2,308,000 in attorneys' fees.
 
 V. CONCLUSION
 
 70
 For the foregoing reasons, we affirm the District Court's denial of the Fund's motion to reinstate its post-mortem right of publicity claim. We also affirm the District Court's grant of Franklin Mint's motion for summary judgment on the Fund's false endorsement claim. We finally affirm the District Court's award of $2,308,000 in attorneys' fees to Franklin Mint.
 
 
 71
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Judge Paez initially handled this action and authored the order granting Defendants' motion to dismiss Plaintiffs' post-mortem right of publicity claim,Cairns v. Franklin Mint Co., 24 F.Supp.2d 1013 (C.D.Cal.1998), and the order denying Plaintiffs' motion to reinstate that claim, Cairns v. Franklin Mint Co., 120 F.Supp.2d 880 (C.D.Cal.2000). After Judge Paez was elevated to the Ninth Circuit, Judge Cooper handled this action and authored the order granting Defendants' motion for summary judgment on Plaintiffs' remaining claims, Cairns v. Franklin Mint Co., 107 F.Supp.2d 1212 (C.D.Cal.2000), and the order granting Defendants' motion for attorneys' fees, Cairns v. Franklin Mint Co., 115 F.Supp.2d 1185 (C.D.Cal.2000).
 
 
 [2]
 Both California Civil Code § 990(a) (West 1998), and California Civil Code § 3344.1(a) (West 2002), provide in part: "Any person who uses a deceased personality's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, without prior consent from the[decedent's successor or successors in interest], shall be liable for any damages sustained by the person or persons injured as a result thereof."
 
 
 [3]
 California Civil Code § 946 states: "If there is no law to the contrary, in the place where personal property is situated, it is deemed to follow the person of its owner, and is governed by the law of his domicile."
 
 
 [4]
 The District Court also granted Franklin Mint's motion for summary judgment on the Fund's Lanham Act dilution of trademark and false advertisement claims and on the Fund's unfair competition and false and misleading advertisement claims under California law. Regarding the Fund's Lanham Act dilution of trademark claim, the District Court concluded that the mark "Diana, Princess of Wales" had not acquired a secondary meaning identifying Princess Diana's charitable services rather than Princess Diana as an individualId. at 1221-22. Regarding the Fund's Lanham Act false advertisement claim, the District Court concluded that there was no evidence that Franklin Mint had made any false statements in its advertisements. Id. at 1222-23. For the same reason, the District Court also granted summary judgment in favor of Franklin Mint on the Fund's unfair competition and false and misleading advertising claims under California Business and Professions Code §§ 17200 and 17500 et seq. Cairns III, 107 F.Supp.2d at 1223 n. 6. The Fund does not appeal these decisions.
 
 
 [5]
 California Civil Code § 946 states: "If there is no law to the contrary, in the place where personal property is situated, it is deemed to follow the person of its owner, and is governed by the law of his domicile." The Fund argues, and we assumearguendo, that its alleged post-mortem right of publicity would be "situated" in California.
 
 
 [6]
 Similarly, the Senate Rules Committee Report on Senate Bill No. 209, as amended March 3, 1999, states:
 SB 209 would state that "pursuant to the jurisdiction provided under Code of Civil Procedure 410.10, a plaintiff has standing to bring an action pursuant to this section if any of the acts giving rise to the action occurred in this state, whether or not the decedent was a domiciliary of this state at the time of death." ... The author [i.e., Senator Burton] asserts that this clarification of law is necessary in light of a recent decision, Lord Simone Cairnes v. Franklin Mint.
 Senate Rules Com. Rep. Cal. S.B. 209 (as amended Mar. 3, 1999) (emphasis added).
 
 
 [7]
 InSleekcraft, we identified a non-exclusive list of eight factors that are relevant in determining whether customer confusion is likely:
 
 
 [1]
 strength of the mark; 2. proximity of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. type of goods and the degree of care likely to be exercised by the purchaser; 7. defendant's intent in selecting the mark; and 8. likelihood of expansion of the product lines
 599 F.2d at 348-49.
 
 
 [8]
 This is in fact the standard case of nominative fair use: Only rarely, if ever, will a defendant choose to refer to the plaintiff's product unless that reference ultimately helps to describe the defendant's own product
 
 
 [9]
 A good example of classic fair use isIn re Dual-Deck Video Cassette Recorder Antitrust Litig., 11 F.3d 1460 (9th Cir.1993). In that case, the plaintiff sold a videocassette recorder, which had two decks in one machine, under the trademark "VCR-2." See id. at 1462. The defendant sold receivers and other machines to which two videocassette recorders could be attached and labeled the relevant terminals on the backs of its machines "VCR-1" and "VCR-2." See id. Thus, the defendant used the mark "VCR-2" only to describe its own products, to which any second VCR could be attached, and not at all to describe the plaintiff's product or any other particular VCR. Accordingly, the classic fair use analysis was appropriate. We held that "[t]he uses were descriptive, and there is no evidence from which an inference of bad faith could be drawn." Id. at 1467.
 
 
 [10]
 The same is true of the cases which we have analyzed as nominative fair use cases followingNew Kids. See Abdul-Jabbar v. General Motors Corp., 85 F.3d 407 (9th Cir.1996) (defendant, a car company, referred to plaintiff, a basketball star who had won an award three years in a row, in a commercial for a car that had also won an award three years in a row); Downing v. Abercrombie & Fitch, 265 F.3d 994 (9th Cir.2001) (defendant, a clothing company, used photograph of plaintiffs, championship surfers, to market T-shirts exactly like those worn by plaintiffs in the photograph); Playboy Enters., Inc. v. Welles, 279 F.3d 796 (9th Cir.2002) (defendant, a former "Playboy Playmate of the Year," used that trademarked phrase of the plaintiff, "Playboy" magazine, on her own website, which offered information about her and free photos of her, advertised photos for sale, advertised membership in her photo club, and promoted her services as a spokesperson).
 
 
 [11]
 In this regard, the facts in the present case are similar to those inAbdul-Jabbar, where we applied the New Kids nominative fair use analysis. As mentioned supra in note 10, the defendant in that case, a car company, referred to the plaintiff, a basketball star who had won an award three years in a row, in a commercial for a car that had also won an award three years in a row. See 85 F.3d at 409. Thus, both in the present case and in Abdul-Jabbar, the defendants used the plaintiffs marks (the name or likeness of Princess Diana and Kareem Abdul-Jabbar, respectively) to describe the plaintiffs "products" (Princess Diana and Kareem Abdul-Jabbar, respectively), although the defendants' ultimate goal was to describe their own products (memorabilia and a car, respectively). That we applied the New Kids nominative fair use analysis in Abdul-Jabbar suggests that we should also apply this analysis in the present case.
 
 
 [12]
 Franklin Mint's other uses of Princess Diana photographs in its advertisements for its Diana-related products are similarly justified: (1) a photograph of Princess Diana wearing a bolero jacket and a royal tiara appears opposite a picture of the similarly equipped "Diana, Princess of Wales Porcelain Portrait Doll"; (2) a photograph of Princess Diana holding a bouquet of white roses "bearing her name" appears next to a picture of "The Princess of Wales Rose" collector plate depicting the same white roses; and (3) a picture of the "Diana, Forever Sparkling Classic Drop Earrings" described as "inspired by those the princess wore at her most memorable occasions" appears below a photograph of Princess Diana wearing similar drop earrings
 
 
 [13]
 The same is true for Franklin Mint's use of Princess Diana's name and likeness in connection with its other Diana-related memorabilia discussedsupra in note 12 and the accompanying text.
 
 
 [14]
 The District Court did not apply the nominative fair use analysis, although it relied heavily on nominative fair use language fromNew Kids. See supra section III.A. Instead, the District Court held that Franklin Mint's use of Princess Diana's name and likeness did not implicate the source-identification purpose of trademark protection, and that there was no likelihood of confusion under Sleekcraft. But "we may affirm a summary judgment on any ground finding support in the record." Karl Storz Endoscopy-Am., Inc. v. Surgical Techs., Inc., 285 F.3d 848, 855 (9th Cir.2002). Moreover, even if we were to apply the 15 United States Code § 1115(b) classic fair use analysis and the Sleekcraft likelihood of confusion test to this case, we would hold that Franklin Mint's use of Princess Diana's name and likeness was a permissible classic fair use, and that there was no likelihood of confusion. First, Franklin Mint did not use Princess Diana's name and likeness "as a trademark," but used them "`fairly and in good faith'" and "`[o]nly to describe' its goods" as required by 15 United States Code § 1115(b). 2 McCarthy, supra, at § 11:49. Second, "the weak association between [Princess Diana's name and likeness] and [the Fund] weighs heavily against finding a likelihood of confusion" and is not outweighed by any Sleekcraft factors that weigh in favor of finding a likelihood of confusion. Cairns III, 107 F.Supp.2d at 1217. Franklin Mint's use of Princess Diana's name and likeness would therefore qualify as a permissible classic fair use without likelihood of confusion.
 
 
 [15]
 By contrast, the District Court found that the false endorsement claim, although ultimately unsuccessful, was not "groundless, unreasonable, vexatious, or pursued in bad faith" and that it was, therefore, not "exceptional" within the meaning of the Lanham Act's authorization of attorneys' feesSee Avery, 189 F.3d at 881; 15 U.S.C. § 1117(a). Franklin Mint has abandoned its appeal of this holding, which is therefore not before us.
 
 
 [16]
 TheKerr factors are:
 (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the `undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.
 Kerr, 526 F.2d at 70.
 
 
 [17]
 In its right of publicity claim, the Fund sought an additional $100-300 million in punitive damages
 
 
 [18]
 Because courts who reject a Lanham Act claim typically do not report how much damages the plaintiff sought in that claim, the ratio between attorneys' fees awarded and damages sought in this unsuccessful Lanham Act case cannot be compared with the corresponding ratios in other unsuccessful Lanham Act cases