**STEPHEN W. BONEY, INC.,**
**Plaintiff–Appellee,**

v.

**BONEY SERVICES, INC.,**
**Defendant–Appellant.**

**STEPHEN W. BONEY, INC.,**
**Plaintiff–Appellant,**

v.

**BONEY SERVICES, INC.,**
**Defendant–Appellee.**

Nos. 96–55469, 96–55576.

United States Court of Appeals,
Ninth Circuit.

Argued; Submission Deferred June 4, 1997.

Resubmitted Sept. 23, 1997.

Decided Sept. 30, 1997.

Janice P. Brown and J. Scott. Scheper, Seltzer, Caplan, Wilkins & McMahon, San Diego, California, for defendant-appellant-cross-appellee.

Henry G. Kohlmann, Arter & Hadden, Irvine, California, for plaintiff-appellee-cross-appellant.

Before: BROWNING, FLETCHER and KOZINSKI, Circuit Judges.

FLETCHER, Circuit Judge:

This case pits brother against brother in a battle for the family name. Tragically, we must resolve this family feud, though we suspect there is no real winner.

Steve Boney, through his corporate alter-ego Stephen W. Boney, Inc. ("SWB"), sued his brothers Stan and Scott Boney, through their corporate alter-ego Boney Services, Inc. ("BSI"), for trademark, trade name, and trade dress infringement. The district court granted summary judgment to BSI, finding that Stan and Scott had continuously used and controlled the name "Boney's Marketplace" since 1983 and therefore had priority over Steve's (or SWB's) use of the name. The district court subsequently denied BSI's motion for attorney's fees under the Lanham Act and SWB's motion for reconsideration under Fed.R.Civ.P. 59. BSI appeals the denial of attorney's fees; SWB cross-appeals the summary judgment entered against him. We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part and reverse in part.

## I. FACTS

The Boney family has owned and operated grocery stores in Southern California for decades. Henry Boney opened his first fruit stand in the 1940s, and his sons Stan, Scott, and Steve have carried on the tradition. In 1980, Stan and Scott created a corporation named Boney & Boney, Inc., to operate a market in El Cajon, California, under the name "Windmill Farms." They also created a partnership to operate a Windmill Farms market in Vista, California. Stan and Scott later created Boney & Boney/Vista, Inc., and transferred to it the partnership's interest in the Vista market. In 1982, Stan and Scott bought a market in Spring Valley, which they held through Boney & Boney, Inc., and operated as a "Windmill Farms" market.

In 1983, Stan and Scott decided to leave the Windmill Farms organization in order to have more quality and advertising control. They renamed their three Windmill Farms markets as Boney's Marketplace. Mike Darr (the Boneys' brother-in-law) and Farm Yard, Ltd., also renamed Windmill Farms markets they owned as Boney's Marketplace.

Stan and Scott entered into a written "cooperative advertising/operating agreement" authorizing Darr and Farm Yard to use the trade name Boney's Marketplace and stating that Boney & Boney, Inc., owned all rights to the trade name. Stan and Scott continued to operate their three markets, maintaining the stores' existing appearance, and to market foodstuffs and vitamins under the Boney's Marketplace private label.

On July 1, 1988, Stan and Scott restructured their corporate entities. Boney & Boney, Inc., sold the right to the trade name Boney's Marketplace, including existing licensing agreements regarding that name, to a limited partnership called Boney's Services, Ltd. Boney's Services, Ltd., then entered into licensing agreements with Mike Darr (president of the El Cajon store) and Norman Frazier (president of the Vista store), granting them non-exclusive licenses to use the trade name Boney's Marketplace.

In 1985, Steve Boney opened a market in Pacific Beach, and another, in Escondido, in 1986. Steve operated both of these markets under the name Boney's Marketplace. In October 1986, Steve incorporated the Escondido store as Stephen W. Boney, Inc.

In October 1985, Stan and Scott (as Boney & Boney, Inc., and Boney & Boney/Vista, Inc.), Mike Darr, and Steve entered into a cooperative advertising agreement. This agreement contained the following provision:

> All rights to use of the "Tradename" [Boney's Marketplace] shall remain with Boney [Stan and Scott's corporations], except that, Steve and Darr shall also have the right to use of the "Tradename" at locations that do not compete with any current or future locations of the Parties.... The right to the "Tradename" shall expire three calendar months after any of the parties sell their store(s) and/or stop contributing to the weekly advertising budget.

Stan and Scott also retained the right to terminate any store's right to use the trade name in response to delinquency or default in contributing to the advertising budget.

In September 1986, Steve sold the Pacific Beach store. In 1989, Steve opened a store in Denver, Colorado, to which he shipped goods bearing the Boney's Marketplace trademark. He subsequently sold the Denver store. Steve has continuously owned and operated the Escondido store since 1986. He sells goods at that store bearing the Boney's Marketplace trademark, including specialty breads baked from trade secret recipes.

Events that transpired between 1989 and 1994 are somewhat unclear. Immediately before and immediately after Stan and Scott's 1988 corporate restructuring, four Boney's Marketplace stores were associated with Stan and Scott and used the trade name with Stan and Scott's permission. Steve owned and operated the Escondido store. Boney's Services, Ltd., merged with BSI. Steve, through SWB, opened two new stores in the San Diego area. Stan and Scott and their associates opened several new stores. Relations between Steve and his brothers deteriorated; their conflict focused on their respective rights to the Boney's Marketplace name.

## II. PROCEDURAL HISTORY

In March 1994, SWB's attorney wrote to BSI's attorney, expressing the position that the 1985 cooperative advertising agreement was not a true trademark license agreement, that Stan and Scott never had the "exclusive" right to the Boney's Marketplace name or mark, and that Steve had established common law trade name and trademark rights within his business area. Steve also submitted a trademark registration application to the United States Patent and Trademark Office.

On April 14, 1995, SWB filed a complaint in the district court against BSI. The complaint alleged seven causes of action for violations of the Lanham Act, 15 U.S.C. §§ 1116, 1117, 1120, and 1125(a), and of California unfair competition law. Cal. Bus. & Prof. Code §§ 14330, 17203; Cal. Civ.Code §§ 3426.2–3426.4.[1]

1. The complaint raised the following claims: (1) declaratory relief establishing Steve's priority in the rights to the trade name, trademark, and trade dress; (2) false affidavit in support of trademark registration application; (3) misappropriation of trade secret recipes; (4) trade

BSI moved to dismiss the complaint or alternatively for summary judgment in their favor. SWB filed a motion under Fed. R.Civ.P. 56(f) to stay consideration of the summary judgment motion pending additional discovery. After a hearing on these motions, the district court granted summary judgment to BSI.

The district court found that BSI was the successor to Boney & Boney, Inc., and that its use of the trade name dated to 1983, prior to Steve's first use in 1985. The district court further found that Boney & Boney, Inc., had not abandoned the mark or granted a "naked license" to BSI. Accordingly, the district court concluded that Stan and Scott had superior rights to the Boney's Marketplace name and mark. The district court also found that BSI's use of the trade dress predated SWB's use. The court dismissed the false affidavit claim for lack of standing, since SWB failed to show it had been damaged by any alleged misstatements. The court declined to exercise supplemental jurisdiction over SWB's state-law claims and dismissed them without prejudice. The court also declined to allow additional discovery, finding that SWB had failed to make the requisite showing of known material facts and that further discovery would not affect the outcome.

SWB moved for reconsideration under Fed.R.Civ.P. 59(a). BSI filed a motion for attorney's fees under Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a). The district court denied both motions. This appeal and cross-appeal followed.

### III. BSI'S ATTORNEYS FEES APPEAL

#### A. STANDARD OF REVIEW

■ We have not previously articulated the standard of review for awards or denials of attorney's fees under the Lanham Act. In *Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1427 (9th Cir.1996), and *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1027 (9th Cir.1985), we reviewed awards of attorney's fees under the Copyright Act un-

der an abuse of discretion standard. Abuse of discretion also is the standard of review for attorney's fees decisions under other provisions. *See Nelson v. Pima Community College*, 83 F.3d 1075, 1080 (9th Cir.1996) (standard of review for general attorney's fees award); *United States v. 87 Skyline Terrace*, 26 F.3d 923, 927 (9th Cir.1994) (standard of review for attorney's fees decisions under Equal Access to Justice Act).

Under the Lanham Act, an award of attorney's fees is within the district court's discretion. 15 U.S.C. § 1117(a) ("The court in exceptional cases *may* award reasonable attorney fees to the prevailing party.") (emphasis added). We therefore conclude that the district court's denial of a motion for attorney's fees under the Lanham Act should be reviewed for an abuse of discretion. *See Burger King Corp. v. Pilgrim's Pride Corp.*, 15 F.3d 166 (11th Cir.1994) (trial court has discretion to grant or deny attorney's fees under Lanham Act). However, we review de novo the district court's legal analysis and interpretation of the Lanham Act, and whether the district court applied the correct legal standard. *See Schwarz v. Secretary of Health & Human Servs.*, 73 F.3d 895, 900 (9th Cir.1995).

#### B. ATTORNEYS FEES UNDER THE LANHAM ACT

■ BSI claims that it is entitled to fees because SWB's lawsuit was "unfounded, not well-grounded in fact or law, or brought for improper purpose." The district court found that the proper inquiry was whether SWB had acted in bad faith or whether its conduct was malicious, wanton, oppressive, or opprobrious. We conclude that the district court did not abuse its discretion in denying BSI's motion for attorney's fees.

Section 35(a) of the Lanham Act provides that "[t]he court *in exceptional cases* may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a) (emphasis added). The Lanham Act nowhere defines what makes a case "exceptional." We have explained that, "[g]enerally, a trade-

dress infringement; (5) trademark infringement; (6) unfair competition; (7) dilution of trademark.

Steve sought declaratory and injunctive relief and damages.

mark case is exceptional for purposes of an award of attorney's fees when the infringement is malicious, fraudulent, deliberate, or willful." *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir.1993); *see also Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 825 (9th Cir.1996) (same). This definition, however, refers to the nature of the defendant's infringement in a case where the plaintiff prevails.

Some courts have held that a prevailing defendant need not show bad faith on the plaintiff's part to prove that a case is "exceptional" under section 35(a). *Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.*, 958 F.2d 594, 599 (4th Cir.1992) (holding that prevailing defendant may receive attorney's fees on showing of "[s]omething less than bad faith"); *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant*, 771 F.2d 521, 526 (D.C.Cir.1985) ("Something less than 'bad faith' ... suffices to mark a case as 'exceptional.'"). The *Scotch Whiskey* court remanded the case for the district court to consider whether the prevailing defendant had been wrongfully accused of trademark infringement. 958 F.2d at 600. The *Noxell* court concluded that the plaintiff's conduct in raising groundless arguments and creating both serious inconvenience and economic hardship for the defendant rendered the case "exceptional." 771 F.2d at 526–27.

Both of those cases relied on the legislative history of section 35(a), pointing to a statement in the Senate report that the attorney's fees provision "would make a trademark owner's remedy complete in enforcing his mark against willful infringers, and would give defendants a remedy against unfounded suits." S.Rep. No. 1400, 93rd Cong., 2d sess. (Dec. 17, 1974), *reprinted in* 1974 U.S.C.C.A.N. 7132, 7137. BSI argues that this history reveals Congress's intent to establish a "dual standard" for determining whether a case is exceptional depending on which party prevails, and that it need not prove SWB acted in bad faith in order to

qualify for attorney's fees under section 35(a).

## C. ATTORNEYS FEES AFTER *FOGERTY*

The district court based its denial of BSI's attorney's fees motion partly on *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994). There, the Supreme Court held that the courts must apply an "evenhanded" standard in determining whether prevailing plaintiffs or prevailing defendants are entitled to attorney's fees under section 505 of the Copyright Act, 17 U.S.C. § 505. *Id.* at 532, 114 S.Ct. at 1033. The district court concluded in light of *Fogerty* that it had to evaluate BSI's motion under the same "bad faith or malicious conduct" standard applicable to prevailing plaintiffs' motions under section 35(a). Although we conclude that the district court was not strictly constrained by *Fogerty*, we agree with it that no attorney's fees are warranted.

*Fogerty's* general mandate that attorney's fees be awarded pursuant to an evenhanded standard may apply in Lanham Act cases. *See FASA Corp. v. Playmates Toys, Inc.*, 108 F.3d 140, 143 (7th Cir.1997). *Fogerty* is not inconsistent with the statement in the Lanham Act's legislative history that section 35(a) serves both to compensate plaintiffs and protect defendants. *Fogerty* holds, in effect, that a single standard apply to the determination whether a prevailing party is entitled to attorney's fees under a particular statute. *See FASA Corp.*, 108 F.3d at 143 (noting that *Fogerty* represents "a turn away from a mode of analysis that distinguishes between prevailing plaintiffs and prevailing defendants"); *see also Sassafras Enter., Inc. v. Roshco, Inc.*, 889 F.Supp. 343, 348 (N.D.Ill. 1995) (holding that *Fogerty* requires that court apply the same standard in awarding attorney's fees to prevailing plaintiffs and prevailing defendants). The applicable standard, however, depends on the applicable statute. Section 505 of the Copyright Act, at issue in *Fogerty*, simply authorizes fee awards to the prevailing party.[2] Section

---

**2.** That section provides in relevant part:
    Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

17 U.S.C. § 505.

35(a) of the Lanham Act, on the other hand, requires exceptional circumstances.

"[B]ad faith of one of the parties may [ ] be part of those exceptional circumstances" warranting a fee award under section 35(a). *Fasa Corp.*, 108 F.3d at 143. "When a plaintiff's case is groundless, unreasonable, vexatious, or pursued in bad faith, it is exceptional, and the district court may award attorney's fees to the defendant." *Scott Fetzer Co. v. Williamson*, 101 F.3d 549 (8th Cir. 1996). These cases suggest that, after *Fogerty*, the standard articulated in *Lindy Pen* and *Committee for Idaho's High Desert*, under which bad faith or other malicious conduct satisfies the exceptional circumstances requirement, applies to both prevailing plaintiffs and prevailing defendants seeking attorney's fees under the Lanham Act.

■ BSI correctly argues that the mere absence of bad faith on SWB's part does not render it ineligible for attorneys fees. While a finding that the losing party has acted in bad faith may provide evidence that the case is exceptional, *see Fasa Corp.*, 108 F.3d at 143, other exceptional circumstances may warrant a fee award. Nevertheless, BSI has failed to demonstrate that this case is exceptional in any respect other than the degree of animosity among the brothers.

Although BSI claims that SWB filed this lawsuit to harass it, Steve Boney stated in his deposition that he brought suit in order to "preserve the right to use the name if and when I want to use it" and that he did not intend to create hardship for or otherwise damage his brothers or their stores. Nothing in the record persuades us that Steve's purpose was other than this legitimate objective.

The district court found that SWB's claims "raised colorable legal and factual issues about the priority date between the various corporate entities." The record supports this finding. The Boney's numerous corporate restructurings and agreements have spawned considerable ambiguity regarding the parties' relative rights to the Boney's Marketplace name. SWB's case was not frivolous and raised debatable issues of law and fact. *See Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 612 (7th Cir.1986)

(denying attorney's fees where opposing party's action was not frivolous and raised debatable issues).The district court did not abuse its discretion in denying BSI attorney's fees, and we affirm the district court's order and judgment to that effect.

## IV. SWB'S TRADEMARK CROSS–APPEAL

### A. STANDARD OF REVIEW

■ We review the district court's grant of summary judgment de novo. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.1996). Viewing the evidence in the light most favorable to the non-moving party, SWB, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* We do not weigh the evidence or determine the truth of any matter. We determine only whether a genuine issue exists for trial. *Abdul–Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th Cir.1996).

### B. TRADE NAME CLAIM

■ SWB argues that the district court erred in granting summary judgment against it on its trade name, trademark, and trade dress claims. SWB contends that its use of the Boney's Marketplace name predates BSI's first use, and that BSI failed to establish the elements of a "tacking" defense based on its corporate predecessors' use.

On May 1, 1997, BSI (now known as Boney's Marketplace, Inc., or BMI) announced that its Boney's Marketplace stores would be renamed "Henry's." All of the Boney's stores except those owned by SWB apparently now are called Henry's. SWB has retained the Boney's Marketplace name for its stores. In light of these developments, we dismiss as moot SWB's appeal of the district court's decision with respect to the Boney's Marketplace trade name. However, the question remains whether the district court erred in granting BSI summary judgment on SWB's trade dress and trademark claims.

## C. TRADE DRESS CLAIM

■ SWB and BSI each submitted evidence indicating that its stores first used dark wood paneling, large produce areas, and low produce-display "gondolas." BSI claims that it began using these features in 1982 or earlier, while SWB claims that BSI did not use all three elements together before SWB did so in 1985 or 1986. The district court found that BSI's use of this alleged "trade dress," through its predecessors, predated SWB's use and therefore granted summary judgment to BSI.

■ The district court applied the wrong standard in disposing of SWB's trade dress claim. In order to prove trade dress infringement under the Lanham Act, 15 U.S.C. § 1125(a), SWB must prove that: (1) the trade dress is inherently distinctive or has acquired distinctiveness through secondary meaning; (2) there is a likelihood that the public will be confused by the infringing use; and (3) the trade dress is nonfunctional. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992). "Trade dress is the totality of elements in which a product or service is packaged or presented. These elements combine to create the whole visual image presented to customers and are capable of acquiring exclusive legal rights as a type of identifying symbol of origin." 1 McCarthy on Trademarks and Unfair Competition § 8:1 (4th ed.1996) (citations and footnotes omitted). Priority of use is not dispositive, and may not even be relevant to the inquiry. We therefore consider whether BSI was entitled to summary judgment under the correct test.

The alleged trade dress is not "inherently distinctive." Accordingly, SWB must prove that it has acquired secondary meaning in order to bring a trade dress infringement claim under the Lanham Act. *Two Pesos*, 505 U.S. at 769, 112 S.Ct. at 2757. SWB has produced·no evidence that the alleged trade dress has acquired secondary meaning such that consumers associate it closely with SWB's stores.

Furthermore, "the elements making up the alleged trade dress must have been *used* in such a manner as to denote product source. Thus, a product feature whose only impact is decorative and aesthetic, with no source identifying role, cannot be given exclusive rights under trade dress law." 1 McCarthy on Trademarks and Unfair Competition § 8:1. SWB has produced no evidence suggesting that wood paneling, large produce areas, and low gondolas serve any purpose in its stores other than to provide an attractive means of displaying produce. Nor has it shown that the composite package of wood paneling, large produce areas, and low gondolas plays any "source identifying role" or otherwise is "nonfunctional." SWB also has produced no evidence that the public is or likely will be confused by BSI's use of the alleged trade dress. Thus, even if the district court had applied the correct test for determining whether a triable issue remained on SWB's trade dress claim, BSI was entitled to summary judgment. We affirm the district court's grant of summary judgment to BSI on the trade dress claim.

## D. TRADEMARK CLAIM

■ Finally, SWB claims that the district court erred in granting summary judgment for BSI on the trademark claim. BSI argues that in relinquishing the Boney's Marketplace trade name for its stores, it has not surrendered its rights to use the Boney's Marketplace trademark on private label goods. Because the parties did not fully and discretely brief the trademark claim, appropriately distinguishing it from the trade name and trade dress claims, we cannot resolve this issue and therefore remand it to the district court.

■ The right to use a term as a trade name for grocery stores is not necessarily co-terminus with the right to use that term as a trademark for goods. *See Self–Realization Fellowship Church v. Ananda Church of Self–Realization*, 59 F.3d 902, 908 (9th Cir. 1995) (analyzing separately challenges to use of the term "Self–Realization" as the name of a spiritual organization and as the title of a product of that organization). "It is equally likely that a term may be in one category when used as a trade name but quite another for a trade mark." *Id.* The distinction be-

tween the trade name "Boney's Marketplace," as used to designate grocery stores, and the trademark "Boney's Marketplace" to designate private-label vitamins, baked goods, and other products, highlights a fundamental principle of trademark law: "Trade names symbolize the reputation of a business as a whole. In contrast, trademarks and service marks are designed to identify and distinguish a company's goods and services." *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1534 (9th Cir.1989).

██ As with the right to the trade name, the right to control use of the trademark depends on priority of use. *See Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2478, 138 L.Ed.2d 987 (1997). Factors relevant to the priority determination include (1) which party first developed and affixed the trademark onto the products in question; (2) which party's name first appeared in connection with the products; (3) which party has maintained the quality and uniformity of the products; (4) with which party does the public identify the products; and (5) which party has the goodwill associated with the products. *See id.* at 1220.

No evidence relevant to this inquiry appears in the record before us. The parties have not briefed or argued this issue as distinct from the trade name or trade dress claims. The district court did not explain the basis on which it granted BSI summary judgment on the trademark issue. We therefore reverse the district court's grant of summary judgment on SWB's trademark claim and remand that issue to the district court for further proceedings.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

**Each party to bear their own costs.**