**GLOBAL MANUFACTURE GROUP, LLC, Plaintiff,**

v.

**GADGET UNIVERSE.COM, E.S. Buys, et al. Defendants.**

**No. 04–CV–2581LAB(NLS).**

United States District Court, S.D. California.

Feb. 1, 2006.

John E. Engel, Law Offices of John E. Engel, Vista, CA, for Plaintiff.

Robert J. Lauson, Lauson and Associates, Manhattan Beach, CA, for Defendants.

## ORDER GRANTING DEFENDANT GADGET UNIVERSE.COM'S MOTION FOR SUMMARY JUDGMENT OF TRADE DRESS CLAIM

Larry Alan BURNS, District Judge.

Defendant Gadget Universe.Com (Gadget) filed a motion for summary judg-

ment in this intellectual property case involving a personal transport system for pedestrians. The electric scooter is the equivalent of a personal, portable moving sidewalk in that it allows the rider to travel at speeds three times faster than foot traffic and the rider stands upright. This motion concerns the trade dress claim brought pursuant to the Trademark Act of 1946 (Lanham Act). 15 U.S.C. §§ 1051–1127. Trade dress refers to the overall appearance of the product design, rather than its mechanics or a specific logo. *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 209–10, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000). Defendant Skymall, Inc., a distributor for Gadget, initially joined the motion, but then withdrew its joinder. Plaintiff Global Manufacture Group, LLC (GMG) requested oral argument, but the Court ordered the matter submitted on the briefs. For the reasons stated below, the Court grants the motion.

### Factual Background[1]

Plaintiff GMG named ten defendants in this action to protect its intellectual property rights in its motorized scooter, known as the "Q Electric Chariot" or the "Q." The name Q is based upon the name of the scientist in the James Bond movies "who creates all of 007's cool gadgets." Def.'s Ex. C at 25.[2]

The upright motorized scooter concept for pedestrians entered the market with wide spread public attention in 2001 when Dean Kamen of Segway LLC introduced its Segway® Human Transporter product. Def.'s Ex. A at 6, 9, 13–19 (listing worldwide media coverage, including a events such as a Segway Fest and Segway Polo; use by postal carriers and firefighters; and use at airports, zoos, and theme parks); Def.'s Ex. G at 81–83 (*The New Atlantis*, Summer 2004). Designed as an alternative to the traditional wheelchair, the Segway scooter operates on a battery rather than fuel, and enables a single rider to travel up to 12 miles per hour on sidewalks. The Segway design has only two wheels, and its gyroscope technology enables the rider to stand up and not lose his balance. Segway describes its "Independence IBOT0 Mobility System" as "a self-balancing mobility device that enables users to climb stairs and negotiate sand, rocks, and curbs." Def.'s Ex. A at 7. That scooter sells for $5,000.

James Wang, the president and owner of Plaintiff GMG, admired the Segway product, and decided to create a simplified, less expensive product. Wang Decl. ¶ 4; *see* Def.'s Ex. G at 74 (BBC News interview with Wang dated Jan. 12, 2004) (" 'When we saw the Segway, we thought it was not a bad idea,' said Mr. Wang, who decided there was room for a cheaper and simpler type of device."). In 2003, he de-

1. The background facts are not intended and shall not be construed as findings of fact by the Court.

 Defendant Gadget filed a document captioned as "Defendant Gadget Universe's Statement of Undisputed Facts and Conclusions of Law." Plaintiff's counsel was unavailable to participate in the process of assembling a joint statement of undisputed facts due to a family member's serious illness. Because the document does not comply with this Court's Standing Order in Civil Cases ¶ 3(d), the document is rejected.

2. In January 2004, Wang applied for registration of a trade mark on the word "Q" in its stylized text. Pl.'s Ex. 3. Wang did receive registration of his registration for Rad2Go mark in stylized form. Def.'s Ex. I Plaintiff's trade marks—as opposed to its trade dress—are not at issue in this summary judgment motion. Plaintiff has not registered its trade dress. Registration of a trade dress on the principal register would have provided, among other benefits, a presumption of validity. 15 U.S.C. § 1115; *Wal-Mart*, 529 U.S. at 209, 120 S.Ct. 1339.

veloped his competing upright scooter. The first public disclosure of the "Q Electric Chariot" occurred in October 2003, when Wal–Mart carried the product on its website; however, the major advertising campaign began in January 2004, when Plaintiff exhibited the scooter at several trade shows. Def.'s Ex. F (2d Supp'l Resp. to Interrog. No. 13). The Q scooter was different than the Segway because it had four wheels for stability and did not have the gyroscope balancing system. Def.'s Ex. E at 7 (Supp'l Interrog. Resp. No. 6); Wang Depo. at 107 (Def.'s Ex. 3). It sells for approximately $1,000, and is carried at store fronts, such as Target and Pep Boys, and on the Internet. *See* Def.'s Exs. B & C; Wang Depo. at 259 (Def.'s Ex. 3); *see also* Def.'s Ex. 7 (June 2004 *Popular Science* magazine referred to Plaintiff's Q scooter as the "Poor Man's Segway"). Wang maintains that the scooter has a unique steering system which the rider can operate either by turning the handle bar for sharp turns *or* by leaning your body weight into the desired direction for a more gradual turn. The Q Electric Chariot also differs from the Segway because it can be converted to carry cargo by attaching a cargo rack to the motorized scooter.

Since mid–2004, Gadget has offered a Rietti Civic Mover Electric Scooter for sale on Internet websites for $700. Pl.'s Ex. 6b; Wang Decl. ¶ 14, 15. Like the plaintiff's Q, the Rietti has two large front wheels and two smaller back wheels to provide stability. *Id.*

In June 2005, the PTO issued a utility patent on the Q Electric Chariot on its seven claims regarding the steering method and the conversion to a cargo rack. Def.'s Ex. P (Patent No. 6,907,949 at 8:35 to 14). A few weeks later, in July 2005, the PTO issued a design patent for the ornamental design. Pl.'s Ex. 1 (Design Patent No. 507,206).

In this action, GMG alleges that defendants have infringed upon Plaintiff's intellectual property rights in the Q electric chariot. This motion, however, concerns only GMG's second cause of action for trade dress infringement, and is brought only by Defendant Global. Compl. ¶ 28–32; 15 U.S.C. § 1125(a)(3).

### Discussion

A party is entitled to summary judgment if the record shows that there is no genuine issue of material fact. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ "[T]rade dress may be protected if it is nonfunctional and has acquired secondary meaning and if its imitation creates a likelihood of consumer confusion." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 842. (9th Cir.1987), *cited with approval in Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769–70, 773–74, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Plaintiff bears the burden of proving three elements of its trade dress infringement claim: (1) non-functionality; (2) secondary meaning; and (3) likelihood of confusion. *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.,* 158 F.3d 1002, 1005 (9th Cir.1998). Because Plaintiff GMG bears the burden of proof on these elements, it must go beyond its own affidavits, and designate the "specific facts" in interrogatories, depositions, and the other evidence produced in discovery showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Only disputes over facts that might affect the outcome of the suit under

the governing law will properly preclude the entry of summary judgment.").

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 252, 106 S.Ct. 2505 (summary judgment standard evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."). Conversely, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

## I. *Trade Dress*

"The Lanham Act was intended to make 'actionable the deceptive and misleading use of marks' and 'to protect persons engaged in ... commerce against unfair competition.' " *Two Pesos,* 505 U.S. at 765, 112 S.Ct. 2753 (quoting 15 U.S.C. § 1127) (footnote omitted). "[T]he Lanham Act provides a remedy for a broad range of deceptive marking, packaging and marketing of goods or services in commerce." *Fuddruckers,* 826 F.2d at 841.

Courts long assumed that the definition of marks in the statute was broad enough to protect symbols, packaging, and the "dressing" of a product. *Wal–Mart,* 529 U.S. at 209, 120 S.Ct. 1339 ("we conclude likewise" that "trade dress constitutes a 'symbol' or 'device' for purposes" of § 42(a) of the Lanham Act). " 'The "trade dress" of a product is essentially its total image and overall appearance.' " *Two Pesos,* 505 U.S. at 765 n. 1, 112 S.Ct. 2753 (quoting *Blue Bell Bio–Medical v. Cin–Bad, Inc.,* 864 F.2d 1253, 1256 (5th Cir. 1989)). "It 'involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques.' " *Id.* (quoting *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 980 (11th Cir.1983)). Trade dress refers to the visual aspects of a product relating to its design or style. *Leatherman Tool Group, Inc. v. Cooper Indus., Inc.,* 199 F.3d 1009, 1011 n. 3 (9th Cir. 1999) (trade dress may be defined as "entire design" or "overall appearance" of a product because "the basic connotation is 'what the product looks like, viewed as a whole.' "); *First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1381–82 (9th Cir.1987) (trade dress of yellow, F-style shaped one gallon jug containers of antifreeze); *Fabrica, Inc. v. El Dorado Corp.,* 697 F.2d 890, 894–95 (9th Cir.1983) & appendix A (trade dress is "the total effect of the [ ] package on the eye and mind of an ordinary consumer," and protected plaintiff's tri-fold display folders for packaging carpet samples).

Courts traditionally protected the trade dress concept under the unfair competition provision of the Lanham Act. *E.g., Vuitton Et Fils S.A. v. J. Young Enter.,* 644 F.2d 769, 772 (9th Cir.1981) (protecting physical details and design of a product); *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979). "Protection of trade dress, no less than of trademarks, serves the Act's purpose to 'secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers. National protection of trademarks is desirable, Congress concluded, because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation.' " *Two Pesos,* 505 U.S. at 774, 112 S.Ct. 2753 (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 198, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985)). In 1999, Congress added an express provision regarding trade dress, thereby validating the broad application of

the Lanham Act. 15 U.S.C. § 1125(a)(3); Pub. L. 106–43, § 5 (1999); *Wal–Mart,* 529 U.S. at 210, 120 S.Ct. 1339 (Congress buttressed the broad reading of the Act by referring specifically to "civil actions for trade dress infringement").

■ "Of course, it is not the purpose of unfair competition law, under the guise of either consumer protection or the protection of business good will, to implement a policy of encouraging innovative designs by protecting them once designed." *Leatherman Tool,* 199 F.3d at 1012 (courts should exercise restraint not to undermine Congress' consistent rejection of legislation to protect industrial design); *see McCarthy on Trademarks,* § 1.2 at 1–4 ("Public domain is the rule: intellectual property is the exception.") (footnote omitted). The Supreme Court has instructed that when a trade dress claim is asserted on the design of a product, "courts should err on the side of caution" because "product design almost invariably serves purposes other than source identification." *Wal–Mart,* 529 U.S. at 213, 216, 120 S.Ct. 1339. Notably, the alternative protection of a design patent, or a copyright, can protect the designer of a product design. *Id.* at 214, 120 S.Ct. 1339.

■ Here, Plaintiff GMG defines its trade dress as the "ornamental and aesthetic, overall shape, appearance and design of the Q Electric Chariot, which is visible to customers." Def.'s Ex. E at 5 (Supp'l Resp. to Interrog. No 2). The trade dress sought to be protected constitutes the product itself; consequently, Plaintiff bears the burden of establishing first, that the features sought to be protected are *not* functional, but were selected arbitrarily or for purely aesthetic reasons; second, that the design has acquired a distinctive meaning such that consumers identify the trade dress with the *source* of the product rather than the product itself; and third, that the infringing product is likely to cause confu-

sion as to its origin. *Wal–Mart,* 529 U.S. at 210, 216, 120 S.Ct. 1339. Defendant Gadget contends that it is entitled to summary adjudication of each of these three elements of Plaintiff's trade dress claim.

A. *Functionality*

■ The Lanham Act expressly states that in trade dress actions when the plaintiff has not registered the trade dress, "the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional." *TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 29, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) (quoting 15 U.S.C. § 1125(a)(3)). Functionality is a question of fact, but is subject to resolution on a summary judgment motion. *Disc Golf,* 158 F.3d at 1006; *Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 614 (9th Cir. 1989).

■ "[T]he physical details and design of a product may be protected under the trademark laws only if they are nonfunctional." *Clamp Mfg. Co. v. Enco Mfg. Co., Inc.,* 870 F.2d 512, 515 (9th Cir.1989). "The requirement of nonfunctionality is based 'on the judicial theory that there exists a fundamental right to compete through imitation of a competitor's product, which right can only be *temporarily* denied by the patent or copyright laws.'" *Id.* at 516 (quoting *In re Morton–Norwich Prod., Inc.,* 671 F.2d 1332, 1336 (C.C.P.A. 1982)). When a product is useful, trademark protection cannot be used to extend the life of the useful invention by protecting the design from competition. "If the utilitarian aspects of the product *are its essence, only* patent law protects *its configuration* from use by competitors." *Id.* (emphasis added); *accord TrafFix,* 532 U.S. at 34, 121 S.Ct. 1255 ("The Lanham Act does not exist to reward manufacturers for their innovation in creating a par-

ticular device; that is the purpose of the patent law and its period of exclusivity."); *Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 164–64, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (functional features can be protected, if qualified as a useful invention, under patent law, but not by the perpetual monopoly of trademark law, which is based upon protecting consumers from confusion as to the source of a product). "For an overall product configuration to be recognized as a trademark, the entire design must be nonfunctional." *Clamp,* 870 F.2d at 516.

The Ninth Circuit observed that "[a]s a practical matter [ ] it may often be difficult to show that the configuration of a useful product is not functional." *Leatherman Tool,* 199 F.3d at 1013 n.6. In *Leatherman Tool,* the Ninth Circuit held that the overall design and appearance of the competitor's pocket tools (including the size of the tools, the shape of the tool, the texture of material, the combination and placement of the elements) was functional. Competitors thus had unrestrained permission to copy "slavishly" or "faithfully," *id.* at 1012 n. 4, those non-functional elements as copying "preserve[s] our competitive economy," *TrafFix,* 532 U.S. at 29, 121 S.Ct. 1255 ("Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying."). Instead, the packaging of the useful item usually conveys the information as to the source or maker of the item, and that information serves the purpose of preventing consumer confusion. *See Leatherman Tool,* 199 F.3d at 1013 (collecting cases).

■ Several factors guide the decision whether a product feature is functional, including: (1) whether the design yields a utilitarian advantage; (2) whether alternative designs are available thereby showing that the plaintiff's choices were arbitrary or aesthetic; (3) whether the advertising touts the utilitarian advantages of the product; and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture. *See Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 823 (9th Cir.1993). "No one factor is dispositive; all should be weighed collectively." *Disc Golf,* 158 F.3d at 1006. The judicial "inquiry is not directed at whether the individual elements are functional but whether the whole collection of elements taken together are functional." *Int'l Jensen,* 4 F.3d at 823. Having reviewed the arguments of counsel and the exhibits presented, the Court concludes that a question of fact exists on the functionality element.

■ Defendant Gadget argues that the elements of Plaintiff's Q scooter are functional. Defendant states that the addition of the two rear wheels, which distinguishes the Q from the better known Segway product (which has the gyroscope technology to provide stability with only two large wheels) serves the function of balancing the scooter for a stable ride. Defendant contends that the two smaller rear wheels also facilitate sharp turns. The rider stands on the platform and holds the handle bars to steer, thus, those features are also functional.

Defendant is correct that each of these visible features serves a function; but its observation is limited to the de facto function of the elements. "[D]e facto functional means that the design of a product *has a function,* i.e., a bottle of any design holds fluid." *Textron,* 753 F.2d at 1025 (emphasis added). Here, the handlebars and the wheels have a useful function in allowing the scooter to operate, and those are the reasons the consumer purchases the product. *Vuitton,* 644 F.2d at 774. But the

important test is to distinguish de jure function from the aesthetic design. "De jure functionality, on the other hand, means that the product is its particular shape because it works better in this shape." *Textron*, 753 F.2d at 1025. For example, while a bottle in any shape holds a fluid, a bottle shaped like an "F" is de jure functional because it is easier to stack for shipping and display. *First Brands*, 809 F.2d at 1381–82. "In contrast, nonfunctional features are those that are arbitrarily affixed or included for aesthetic purposes." *GMC v. Let's Make A Deal*, 223 F.Supp.2d 1183, 1196 (D.Nev.2002) (finding unique and ornamental design of the Hummer vehicle eligible for trade dress protection). For example, the hourglass shaped, green, fluted bottle of the Coca–Cola company is protected by trade dress. *E.g., Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 757 (6th Cir.1998) (Marin, C.J., dissenting) ("Doubtless no symbol in the world is so readily recognized.").

Plaintiff has submitted evidence to support its position that the overall design is aesthetic, ornamental, and incidental. For example, the inventor, Wang, testified at his deposition that he selected the shape and length of the platform for its visual appeal. Def.'s Ex. 3 (Wang Depo. at 102–03, 106–07, 109); *see* Pl.'s Ex. 1 (Figs. 1 & 2 of Design Patent). The front view photographs of the scooter show the curved shape of the handlebars and the recessed headlight. Pl.'s Ex. 1 (Fig. 3 of Design Patent). These design elements are arbitrary and appear to have been selected on the whim of the designer. Also, there is evidence that alternative designs exist, for example, the Columbia Chariot is shaped more like a wheel barrow and comes in a choice of colors in addition to basic yellow. Def.'s Ex.6.

Plaintiff's argument is also supported because its advertisements do not tout the function of the design, but rather focus on the engineering advantages of the scooter, such as the life of the battery and the charge, the ability to carry a load up to 250 pounds, and safety features, such as turn signals and horn. Def.'s Exs. B & C; *cf. Clamp Mfg.*, 870 F.2d at 515 (advertisements had "heavily, if not exclusively, touted the utilitarian aspects of its product").

Finally, the design patent, which protects the "new, original and ornamental" appearance of the scooter, 35 U.S.C. § 171, is evidence supporting Plaintiff's contention that the trade dress is not functional, *see Lee v. Dayton–Hudson Corp.*, 838 F.2d 1186, 1188–89 (Fed.Cir.1988) (the design patent protects the non-functional aspects of a useful article). Plaintiff's design patent claims "the ornamental design for a motor driven vehicle for transporting a standing person," as illustrated in five views of the scooter. Pl.'s Ex. 1; *see Hupp v. Siroflex of Am., Inc.*, 122 F.3d 1456, 1464 (Fed.Cir.1997) ("A design patent contains no written description; the drawings are the claims patented subject matter."). The design patent carries a presumption that it is valid. 35 U.S.C. § 282.

Defendant Gadget places heavy emphasis on the issuance of the utility patent. A close inspection of the *claims* of the patent, however, demonstrate that the utility patent is limited to the invention of the steering method and the conversion of the scooter to carry cargo. Def.'s Ex. P at 191–94. "[C]laims define the scope of patent protection." *Johnson & Johnston Assoc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1052 (Fed.Cir.2002) (en banc) (the scope of utility patent is defined by the patent's claims). The Court's reading of the seven *claims* of the utility patent support that limitation. That the patent generally describes the physical embodiment of the invention (such as the platform and the handlebars, and as

illustrated in the figures) does not detract from this essential distinction of the purpose of utility patent. And, as noted above, the issuance of the *design* patent for the ornamental characteristics creates a presumption of validity of that design patent for those visual elements.

In sum, each party has presented persuasive evidence on the functionality element, thus, this element is not suitable for resolution by a summary judgment motion.

### B. *Distinctiveness or Secondary Meaning*

When trade dress is asserted for a product design, the plaintiff is required to show "acquired meaning" for product design to be eligible for protection by the Lanham Act. *Wal–Mart*, 529 U.S. at 216, 120 S.Ct. 1339; *GMC*, 223 F.Supp.2d at 1195 (applying *Wal–Mart* to shape and total image of Hummer vehicle). "Secondary meaning is another way of expressing the distinctiveness of a trademark," and the "basic element" is "the mental association by a substantial segment of consumers and potential consumers" with the single source of a product. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir.1985) (en banc); *accord Vision Sports*, 888 F.2d at 615 ("A plaintiff's trade dress acquires secondary meaning when the purchasing public associates the dress with a particular source."). That is, "when the purchasing public associates the . . . dress with a *single producer or source rather than with the product itself.*" *Int'l Jensen*, 4 F.3d at 824 (emphasis added).

 Whether a trade dress has acquired a secondary meaning is a question of fact. *Vision Sports*, 888 F.2d at 614. The courts examine various factors to assess if a "learned association" exists between the source and the appearance of the product, and it is normally shown by direct consumer testimony that purchasers associate the design with the source. *Fili-*

*pino Yellow Pages, Inc. v. Asian Journal Pubs., Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999). Another factor is whether plaintiff's use of the particular configuration has been exclusive. *Vision Sports*, 888 F.2d at 615; *Clamp*, 870 F.2d at 517. The length and manner of advertising is relevant, as are the sales figures. *Filipino Yellow Pages*, 198 F.3d at 1151; *Clamp*, 870 F.2d at 517. "While evidence of a manufacturer's sales, advertising and promotional activities may be relevant in determining secondary meaning, the true test of secondary meaning is the *effectiveness* of this effort to create it." *Int'l Jensen*, 4 F.3d at 824 (emphasis added). Thus, customer surveys are strong evidence. *Levi Strauss*, 778 F.2d at 1358 ("An expert survey of purchasers can provide the most persuasive evidence of secondary meaning.").

 Evidence such as customer surveys are important because the purpose of the trade dress protection is to protect consumers from confusion or deception; therefore, the purchasing public's perspective is central to the determination of acquired meaning. *Two Pesos*, 505 U.S. at 773, 112 S.Ct. 2753 ("the protection of trademarks and trade dress under § 43(a) serves the same statutory purpose of preventing deception and unfair competition"). Consequently, the Ninth Circuit prefers evidence from actual customers or the buying public on the issue of distinctiveness, rather than the opinions of those connected to the business, such as the president or employees. *Filipino Yellow Pages*, 198 F.3d at 1152 (in summary judgment context, upholding district court's evidentiary ruling to strike portions of declaration from the founder and president of plaintiff's company as inadmissible and/or lacking in substantial probative value on secondary meaning); *Norm Thompson Outfitters, Inc. v. GM Corp.*, 448 F.2d

1293, 1297 (9th Cir.1971) (testimony from persons closely associated with the business does not adequately reflect view of buying public). Similarly, the Ninth Circuit affords little weight to declarations from wholesalers, dealer, or other business associates because "[e]vidence of secondary meaning from a partial source possesses very limited probative value." *Filipino Yellow Pages*, 198 F.3d at 1152; *accord Japan Telecom, Inc. v. Japan Telecom America, Inc.*, 287 F.3d 866, 870 (9th Cir. 2002) (because an acquired secondary meaning requires a showing of mental recognition by *buyers*, two incorrectly addressed letters (one from a supplier) and six declarations from business owners were not sufficient evidence to defeat summary judgment); *Self–Realization Fellowship Church v. Ananda Church of Self–Realization*, 59 F.3d 902, 910 (9th Cir. 1995) (declarations from employees and wholesalers had "little probative value regarding the assessment of consumer perception," therefore, failed to raise question of material fact sufficient to defeat summary judgment motion).

■ In addition, a plaintiff must show its product acquired this meaning *before* the defendant introduced its competing product. *Id.; accord Braun, Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 826 (Fed.Cir.1992). Here, the evidence shows that Plaintiff GMG first offered its scooter for sale in October 2003 on the Wal–Mart website, but concentrated its marketing efforts in early 2004, beginning with a trade show in Las Vegas. Plaintiff contends that four to six months later, Defendant Gadget started importing and selling its Rietti scooter on websites. Given the very brief time that Plaintiff GMG's scooter had been on the market, it is highly unlikely that the purchasing public would have formed a mental association between the overall shape of the Q scooter and the Plaintiff as "the" source. *Braun*, 975 F.2d at 826 ("while not impossible, it is difficult

for a product to acquire secondary meaning during an 18–month period").

■ Nonetheless, Plaintiff GMG contends that it has presented evidence that shows a triable issue of fact on the distinctiveness of its Q Electric Chariot. The Court, however, agrees with Defendant Gadget that the evidence falls short of precluding summary adjudication. In his declaration submitted with this motion, Wang states that his product received extensive media coverage. Wang Decl. ¶ 7; *accord* Def.'s Ex. E (Supp'l Resp. to Interrog. No. 7). Without specifying the dates or providing underlying evidence, Wang states that national television shows, such as *The Ellen Show* and *The Wayne Brady Show*, as well as in flight broadcasts on major airlines have highlighted the Q scooter. *Id.* Plaintiff also produced a *Popular Science* magazine that featured the Q scooter as a "hot product" of 2004. Def.'s Ex. 7; Def.'s Ex. 3 (Wang Depo. at 267–68). Wang further states that he exhibited his scooter at fourteen trade shows and related events, such as the Del Mar Fair, in early 2004. Wang Decl. ¶ 7; Def.'s Ex. E (Supp'l Resp. to Interrog. No. 7). In his declaration, Wang states that the company spent "hundreds of thousands of dollars in marketing, promoting, advertising costs and barter exchange." Wang Decl. ¶ 8. Plaintiff claimed to be compiling the actual advertising figures, but has not provided any supporting documentation to its opposition to this motion. Def.'s Ex. E (Supp'l Resp. to Interrog. No. 10) (dated June 1, 2005). Similarly, Plaintiff reports quarterly sales of the Q Electric Chariot as being $2.6 million in the last quarter of 2003, $1.4 million in the first quarter of 2004, with sales steadily declining during 2004, and bottoming out at $18,000 in the third quarter of 2004. Def.'s Ex. E (Supp'l Resp. to Interrog. No. 19). Plaintiff also promised to provide supporting documentation of its

sales and profits, but no such documents have been submitted with its opposition to this motion. *Id.* Overall, this evidence is not strong enough to create a question of fact on the distinctiveness element. The Court agrees with Defendant Gadget that these assertions are vague and conclusory, and are collectively insufficient to defeat the summary judgment motion. Plaintiff bears the burden of proof, and has the duty to come forward with specific evidence. *Disc Golf,* 158 F.3d at 1009 (where plaintiff provided no evidence on cost of manufacturing, factor weighs in defendant's favor in summary judgment motion). Despite the promise in the deposition that evidence would be forthcoming, Plaintiff has not submitted those documents with its opposition to this motion.[3]

In addition to Plaintiff's failure to present concrete evidence to support its general allegations, the evidence that was produced does not demonstrate that the public associated the trade dress of the Q scooter with Plaintiff, as opposed to the product itself. *Clamp,* 870 F.2d at 517 ("A product configuration has secondary meaning if the purchasing public associates that configuration with a particular source."). As noted above, given the brief time that Plaintiff's product was available before the Defendant Gadget, and many others, began selling its competing model, it is highly unlikely that the public could have developed an association with Plaintiff as "the" source of the scooter. Moreover, Plaintiff GMG entered the market several years after the famous Segway scooter had been introduced. The Segway scooter, which has the fame associated with the first such scooter to enter the market, has been on market with extensive media coverage since 2001. Despite Wang's bare assertion to the contrary, the Segway scooter is visually similar to Plaintiff's product—as judged from the point of view of an ordinary consumer, not a designer with twenty-years of experience in the business. *Vision Sports,* 888 F.2d at 616 (trade dress judged by "eye of the ordinary purchaser") (quoting *First Brands,* 809 F.2d at 1384). Thus, Plaintiff's scooter entered a crowded market that was dominated by a well-known alternative. *E.g.,* Def.'s Ex. G (BBC News story captioned "Scooter clone takes on the Segway" and PCMag.com article describes Plaintiff's scooter as a "Segway Clone" and a possible "knockoff" or "clever imitation"). On this record, Plaintiff's circumstantial and uncorroborated testimony of its advertising and sales is not convincing evidence that the public associated the configuration of the scooter with Plaintiff as the source. *Cf. Clamp,* 870 F.2d at 517 (evidence of advertising over a substantial period of time).

Significantly, Plaintiff GMG did not conduct any survey of the purchasing public to support its claim that its trade dress had acquired an association with GMG as the source. Def.'s Ex. E (Supp'l Resp. to Interrog. No. 20); *e.g., Vision Sports,* 888 F.2d at 615 (plaintiff commissioned an expert survey of purchasers to show secondary meaning); *cf. Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1263–64 (9th Cir.2001) (survey of customers can create question of fact whether trade dress acquired secondary meaning). The conclusory statements by Plaintiff GMG

---

**3.** Plaintiff last supplemented its interrogatory responses on about June 1, 2005. Wang's deposition was taken on September 1, 2005. Discovery closed on December 30, 2005. Thus, Plaintiff GMG has had adequate time to produce the promised documents.

Plaintiff GMG has not opposed this motion on the ground that it was premature, or that it was unable to present the evidence with its opposition because, for example, the material was not in its possession. Fed.R.Civ.P. 56(f); *Allstate Ins. Co. v. Gilbert,* 852 F.2d 449 (9th Cir.1988).

that "the public identifies Q Electric Chariot with plaintiff as the source of its motorized scooter and to identify and distinguish the Q from those manufactured or sold by others"; that "the product's appearance has become unmistakenly associated by wholesalers, retailers, and the public with Plaintiff"; and that "its trade dress is distinctive and strong" are insufficient because Plaintiff failed to provide evidence to support these broad statements. Def.'s Ex. E (Supp'l Resp. to Interrog. No. 7). In this respect, the instant case is similar to those cases in which the Ninth Circuit determined that a plaintiff's own uncorroborated declaration carried little probative weight and did not create a genuine issue for trial. *Japan Telecom,* 287 F.3d at 872–75 (granting summary judgment because proffered declarations from former customers did not equate with same association by the relevant buying public); *Filipino Yellow Pages,* 198 F.3d at 1152 (granting summary judgment when "vague, uncorroborated, and clearly self-interested testimony" of holder of mark regarding consumer confusion and lost revenue insufficient to establish secondary meaning); *Self–Realization,* 59 F.3d at 910 ("trademark law is skeptical of the ability of an associate of a trademark holder to transcend personal biases to give an impartial account of the value of the holder's mark").

The Supreme Court stated, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. In this case, Plaintiff GMG has failed to identify specific facts or produce sufficient evidence that shows there is a genuine issue on the distinctive-ness of its trade dress with the particular source.

## C. *Likelihood of Confusion*

 Once a plaintiff has shown that its trade dress is entitled to protection, "liability under § 43(a) requires proof of the likelihood of confusion." *Two Pesos,* 505 U.S. at 769–70, 112 S.Ct. 2753 (citing *First Brands,* 809 F.2d at 1381). "This is 'the core element of trademark infringement.'" *Int'l Jensen,* 4 F.3d at 825. In addition to evidence of actual consumer confusion, courts evaluate several factors to determine whether confusion is likely, including the strength of plaintiff's trade dress; the similarity between the competing products and whether the copying was deliberate; the degree of care consumers devote to selecting the type of product; and the products' market and advertising channels. *Clamp,* 870 F.2d at 517 (citing *AMF,* 599 F.2d at 348–49).

In this case, the products are markedly similar in visual appearance. From the original color photographs filed with this motion, the front of the two scooters are visually very similar in their outward appearance. Pl.'s Ex. 5a (Q scooter) & 5b (Rietti scooter). Plaintiff contends that this shows deliberate copying. *E.g., Clicks Billiards,* 251 F.3d at 1264 (plaintiff showed defendant had visited its establishment, visually examined elements, and took measurements of features).

Moreover, Plaintiff contends that while it has a reason to use the "Q" symbol on its platform mat in a reference to the creative gadgets featured in James Bond movies, the Defendant has stated no reason for including an "O" on its product. Defendant denies use of the "O" symbol on its product, Elnekaveh Decl. ¶ 2, and the Court is unable to tell from the exhibits submitted with this motion whether such a

symbol appears on the platform of Defendant's scooter.

Plaintiff then notes that the angle of the photograph used in the advertisements and that fact that marketing on the Internet does not allow customers to inspect the products closely aggravates this likelihood of confusion. Wang Decl. ¶ 15. Defendant argues that these allegations bear little weight given the fact that Defendant has consistently advertised its product under its name, the Rietti Civic Mover. Def.'s Exs. M, N, & O (numerous advertisements of Rietti scooter); Elnekaveh Decl. ¶ 2. Use of the name prevents confusion as to source of scooter, even when the products are visually similar. This is particularly true because the item is an expensive novelty, and the purchasing public will exercise more care in making a decision whether to purchase an electric scooter.

■ Plaintiff contends that it has evidence of actual confusion. In June 2005, Plaintiff claimed to be compiling "[d]etailed descriptions of instances of actual confusion," but has not provided any such documentation in support of its opposition to this summary judgment motion. Def.'s Ex. E (Supp'l Resp. to Interrog. No. 12). The one document Plaintiff provides is an e-mail message from an Internet dealer in Kansas, who is only identified in that document by his first name, Dave.[4] Pl.'s Ex. 8. Dave reported in May 2004 that "most customers cannot differentiate [plaintiff's product] from the junk scooters being offered by . . . knock off sites at significantly lower prices." He reports that "[i]t's got-

ten to the point that I have customers send me pictures of their 'Rad2Go' scooter so I can tell if its genuine." *Id.* Dave warns that he may stop carrying plaintiff's product "because of this perceived association with these ripoff organizations." *Id.*

This evidence is not sufficient for two reasons. First, Dave personally has no trouble distinguishing the "genuine" Q scooter from the competing brands, as his customers rely on him to identify genuine Q scooters. As for Dave's report that consumers have been confused, his statement is hearsay. Fed.R.Evid. 802; *Japan Telecom*, 287 F.3d at 874 n. 1 (statements that declarant knows of others who were confused by similar trade marks is inadmissible hearsay). Second, as a distributor of Plaintiff's product, Dave's opinion has little probative value on the question of the purchasing public's confusion. *Filipino Yellow Pages*, 198 F.3d at 1152 ("Evidence of secondary meaning from a partial source possesses very limited probative value."). Plaintiff had ample opportunity to produce evidence to support his claim of consumer confusion. As discovery has now closed, this evidence is insufficient to preclude summary adjudication of this element of the trade dress claims. *See Disc Golf*, 158 F.3d at 1009 (granting summary judgment when plaintiff failed to provide sales data and other information to support its trade dress claim). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims," *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548.

---

4. The Court takes judicial notice of the fact that the 758 area code serves Hays and Topeka, Kansas. Fed.R.Evid. 201; *LCI Comm., Inc. v. Wilson*, 700 F.Supp. 1390, 1393 (W.D.Pa.1988); see *555–1212.com, Inc. v. Comm. House Int'l*, 157 F.Supp.2d 1084, 1090 (N.D.Cal.2001).

Counsel for Gadget offers to impeach the e-mail because Dave told him in a telephone conversation in June 2005 that he had written

the e-mail at the request of Wang's son, Brad Baron, who is also an employee of Plaintiff's company. Def.'s Objs. to Wang Decl. ¶ 6. The Court does not evaluate the credibility of evidence in a summary judgment; nonetheless, the allegation illustrates the importance of presenting information from actual customers rather than from distributors. It also highlights the value of customer surveys by experts.

Similarly, Wang testified in his deposition that he had listened to ten voice mail messages in which dealers complained about being confused between the Q Electric Chariot and the Rietti. The phone messages had been recorded on the telephones of other employees at GMG, but Wang had listened to them. Although Wang promised to provide the names of the dealers who left those messages, there is no evidence in the instant motion to support Wang's testimony. In any event, like the e-mail from the Kansas dealer, evidence from other dealers is insufficient to create a question of fact. *Filipino Yellow Pages*, 198 F.3d at 1152 (declarations from wholesalers have little probative value because of business bias). Because GMG bears the burden of proving a likelihood of confusion, its failure to present specific facts to support this element is fatal to its trade dress claim.

While issues such as the likelihood of confusion may be "routinely submitted for jury determination as a question of fact," *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1355 n. 5 (9th Cir.1985), *cited in Clicks Billiards Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1264–65 (9th Cir.2001), "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims," *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548. When plaintiff has failed to present genuine issue of fact, summary judgment is appropriate. *Chesebrough–Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393 (9th Cir.1982) (granting summary judgment because no likelihood of confusion); *see Murray v. Cable Nat'l Broadcasting Co.*, 86 F.3d 858 (9th Cir.1996) (dismissing trade mark action because, as a matter of law, no likelihood of confusion).

In sum, while there is a factual dispute as to whether Plaintiff's trade dress is non-functional, no reasonable trier of fact could find that the purchasing public associates the trade dress of the Q scooter with Plaintiff GMG as the source, or that there is likelihood of confusing consumers with the identity of the maker of the scooter. Because Plaintiff has failed to make a sufficient showing on these two essential elements of its trade dress claim, on which it will bear the burden of proof at trial, the Court grants Defendant Gadget's motion for summary adjudication of the trade dress infringement cause of action.

## II. *Attorney's Fees*

"Section 35(a) of the Lanham Act provides that 'the court in exceptional cases may award reasonable attorney fees to the prevailing party.' " *Stephen W. Boney, Inc. v. Boney Services, Inc.*, 127 F.3d 821, 825 (9th Cir.1997) (quoting 15 U.S.C. § 1117(a)). " 'Bad faith of one of the parties [ ] may be part of those exceptional circumstances' warranting a fee award under section 35(a)." *Id.* (quoting *FASA Corp. v. Playmates Toys, Inc.*, 108 F.3d 140, 143 (7th Cir.1997)). A case is considered exceptional " 'when the infringement is malicious, fraudulent, deliberate, or willful.' " *Id.* at 826 (quoting *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir.1993)). Alternatively, attorney's fees may be awarded "[w]hen a plaintiff's case is groundless, unreasonable, vexatious, or pursued in bad faith." *Id.* at 827 (quoting *Scott Fetzer Co. v. Williamson*, 101 F.3d 549, 555 (8th Cir.1996)).

The Court has read and considered the competing allegations of the attorneys involved in the pretrial proceedings, including discovery disputes and settlement discussions. While it is unfortunate that the attorneys have a contentious relationship, the record does not reveal a basis for declaring the case "exceptional." Accordingly, the request for attorney's fees and sanctions is denied without further discussion.

**1176**

*Conclusion*

Upon due consideration of the memoranda and exhibits, a review of the record, and for the reasons set forth above, the Court hereby GRANTS Defendant Gadget Universe.Com's motion for summary adjudication on the second cause of action in the complaint. [# 39] It is hereby adjudged that Plaintiff's federal trade dress claim fails as a matter of law.

The Court strikes the pleading captioned "Defendant Gadget Universe's Statement of Undisputed Facts and Conclusions of Law," filed September 30, 2005, for failure to comply with Standing Order in Civil Cases ¶ 3(d). [# 48]

**IT IS SO ORDERED.**